ATTORNEY FOR THE RESPONDENT
Kevin P. McGoff
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
David B. Hughes, Staff Attorney
Indianapolis, Indiana



FILED
Mar 12 2012, 3:51 pm
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 49S00-0910-DI-425

IN THE MATTER OF:

CARL J. BRIZZI,

*Respondent.*

Attorney Discipline Action
Hearing Officer Charles D. O'Connor

**March 12, 2012**

**Per Curiam.**

We find that Respondent, Carl J. Brizzi, engaged in attorney misconduct by making public statements as a prosecutor that had a substantial likelihood of materially prejudicing adjudicative proceedings and a substantial likelihood of heightening public condemnation of the criminal defendants. For this misconduct, we find that Respondent should receive a public reprimand.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties.

Respondent's 1994 admission to this state's bar subjects him to this Court's disciplinary jurisdiction.  See IND. CONST. art. 7, § 4.

## I.  Background

A.  The Commission's Allegations.

Respondent was the prosecuting attorney of Marion County, having been elected in 2002 and re-elected in 2006.  During Respondent's two terms, the Prosecutor's Office filed close to 100 murder cases, including five death penalty cases.  The Commission charged Respondent with the following two counts of misconduct relating to public statements concerning murder cases.

Count 1.  Respondent conducted a press conference on April 10, 2008, announcing the filing of a murder charge against Bruce Mendenhall for the murder of Carmen Purpura, who was last seen at an Indianapolis truck stop.  Mendenhall had murder charges pending in Alabama and Tennessee, and he had been previously convicted of murder in Tennessee.  According to media reports, Respondent's statements included the following:

➢ DNA testing of blood taken from Purpura's parents matched blood inside the cab of Mendenhall's truck.

➢ "When the officer opened up the cab of the truck, you can imagine his surprise, because the cab of the truck was literally awash with blood."  Purpura's blood "soaked" the seats of Mendenhall's truck.

➢ Enough blood matching the DNA of Purpura's parents was found inside the cab of Mendenhall's truck to determine that she could not possibly be alive.

➢ The "DNA analysis of [the blood] shows that it's not just the blood of one victim, but the blood of several victims."

➢ The victims were shot after their heads were wrapped in plastic wrap and duct tape.

➢ A .22 caliber handgun used by Mendenhall in the killings was found in his truck.

➢ Mendenhall had admitted to the police when arrested that Purpura had been shot in the back of the head at the Indianapolis truck stop, then left inside a vehicle parked at a nearby restaurant, but that he denied being the murderer.

2

➢ Respondent was confident that he had enough evidence to convict Mendenhall.

➢ Respondent was "working with the other jurisdictions to see the quickest way and the best way to punish [Mendenhall] with the ultimate punishment - a capital sentence."

Purpura's body has never been discovered. Nothing further has occurred in the Indiana prosecution because Indiana is deferring to the other states' prosecutions.

Count 2. On or about June 1, 2006, seven family members, including three children, were discovered murdered in their east side Indianapolis home. The County Prosecutor's Office issued a press release on June 6, 2006, after Desmond Turner and James Stewart were charged with the murders. The press release included the following:

> Brizzi said, "According to the probable cause affidavit, Desmond Turner and James Stewart thought there was a large amount of money and drugs at 560 North Hamilton Street. They weren't going to let anyone or anything get in the way of what they believed to be an easy score. There was no money in that house. There were no drugs. Seven bodies were carried out, including those of three children. I would not trade all the money and drugs in the world for the life of one person, let alone seven. Turner deserves the ultimate penalty for this crime."

> Regarding the swiftness with which the death penalty was filed, Brizzi said "The evidence is overwhelming. There are several aggravators present, any one of which would merit the death penalty. To do otherwise would be a travesty."

The Charges. The Commission charged Respondent with violating the following Indiana Professional Conduct Rules:

Rule 3.6(a): "A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."

Rule 3.8(f): "The prosecutor in a criminal case shall . . . except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose,

3

refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused . . . ."

### B. The Hearing Officer's Report.

Count 1. The hearing officer concluded for several reasons that the Commission had not met its clear and convincing burden of proof that Respondent had violated the rules charged in Count 1. The following reasons are based on the hearing officer's perception of weakness in the evidence that Respondent actually made some of the statements at issue:

➢ The statements that "the victims were shot after their heads were wrapped in plastic wrap and duct tape," that Respondent "was confident that he had enough evidence to convict Mendenhall," and "that a .22 caliber handgun used by Mendenhall in the killings was found in his truck" do not appear as a quotation and Respondent does not recall making these statements.

➢ Respondent's public comments, while serving as prosecutor, have been misquoted in the media on a number of occasions.

Hearing Officer's Report at 4, 6. The hearing officer also posited the following bases for his conclusion that Respondent had not violated the rules charged with respect to some of the statements:

➢ The statements concerning DNA analysis, plastic wrap, a .22 caliber handgun, and the large amount of blood discovered were previously documented in the media and/or the probable cause affidavit. "Thus, these statements were based on publicly available information and are protected by the safe harbor provision in Rule 3.6(b)."

➢ Although the statements about punishing Mendenhall with the ultimate punishment may not have been necessary to inform the public of the nature and extent of Respondent's actions as prosecutor, and although Respondent knew or should have known the statements would be disseminated by means of public communication, the evidence does not meet the clear and convincing standard required to conclude that these comments had a substantial likelihood of heightening public condemnation of Mendenhall or would materially prejudice an adjudicative proceeding.

Hearing Officer's Report at 13.

Count 2. The Turner and Stewart cases involved Hispanic victims and African-American suspects, resulting in some racial tension in the community. Media coverage of the cases was constant and extensive, and news cameras were present for nearly all court proceedings.

4

Eventually, the presiding judge, Judge Robert R. Altice of the Marion Superior Court, told both sides to stop commenting about the cases to the media, and the parties agreed. Judge Altice remained concerned about the potential publicity issue and maintained statistics concerning potential jurors who were questioned about pre-trial publicity and their knowledge of the cases.

While Turner's murder case was pending, additional charges of assault and battery on corrections officers were brought against Turner, which resulted in three jury trials occurring prior to Turner's murder trial. Judge Altice presided over each case, and Turner was convicted in each case. Turner ultimately waived his right to a trial by jury in the murder case in exchange for dismissal of the death penalty charge. Turner was convicted of the murder charges during a bench trial in October 2009. Stewart was convicted of murder at a jury trial in December 2009.

The hearing officer concluded that the Commission had not met its burden of proof concerning the charges in Count 2, reasoning:

> ➢ Although certain statements in the press release were not necessary to inform the public about the nature and extent of the Respondent's actions as prosecutor, the evidence was not clear and convincing to prove a substantial likelihood of heightening public condemnation of Turner and Stewart or of materially prejudicing an adjudicative proceedings in the matter.

> ➢ The delay between the June 6, 2006, statements and the trial dates for Turner and Stewart (mid to late 2009) indicated an extremely low likelihood, if any, that substantial prejudice occurred.

> ➢ Judge Altice had no knowledge of any statements alleged in Count 2 of the verified complaint until requested to testify in this matter.

> ➢ Pre-trial publicity in the Stewart and Turner jury trials did not affect the court's ability to select unbiased jurors in Turner's three jury trials for battery or in Stewart's jury trial for murder.

> ➢ Turner ultimately waived his right to a trial by jury in his murder case in exchange for dismissal of the death penalty charge.

Hearing Officer's Report at 10, 14.

## II.  Discussion

A.  Burden of Proof and Standard of Review.

The Commission carries the burden of proof to demonstrate attorney misconduct by clear and convincing evidence.  See Ind. Admission and Discipline Rule 23(14)(h); Matter of Siegel, 708 N.E.2d 869, 870 (Ind. 1999).  The review process in disciplinary cases involves a *de novo* examination of all matters presented to the Court, including review not only of the Hearing Officer's report but also of the entire record tendered in the case.  The Hearing Officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses, but this Court reserves the right to make the ultimate determination.  *See* Matter of Kern, 555 N.E.2d 479, 480 (Ind. 1990).

B.  Disputed Facts Regarding Respondent's Alleged Statements.

Count 1.  In Respondent's answer to the paragraph of the Commission's verified complaint setting forth the statements alleged in Count 1, Respondent stated he was without sufficient knowledge to admit or deny the allegation.  Respondent testified that he did not recall making at least some of the specific statements alleged, and the hearing officer found that Respondent's public comments were misquoted in the media on a number of occasions.  We defer to the hearing officer's conclusion that the Commission did not meet the demanding clear and convincing evidence standard that Respondent made the statements alleged in Count 1.  For future guidance, however, the Court will address below the hearing officer's conclusions that the statements, if made, did not violate the rules charged.

Count 2.  The underlying facts relating to this count are, for the most part, undisputed. There is no dispute regarding the contents of the official press release at issue, and Respondent accepts responsibility for the content of all communications made by his staff and attorneys acting under his direction while he was serving as prosecutor.  The primary factual issue is the extent to which those statements, if improper, were substantially likely to cause prejudice to the criminal defendants and/or to an adjudicative proceeding.  After examining the results of jury questionnaires and other evidence, the hearing officer found that pre-trial publicity did not actually place Stewart or Turner in grave peril and it did not actually affect the trial court's ability

6

to select unbiased jurors.  Hearing Officer's Report at 14.  We accept these findings that **no actual prejudice** resulted from Respondent's statements.   For the reasons below, however, we do not agree with his finding that there was insufficient evidence to prove **a substantial likelihood** of heightening public condemnation of Turner and Stewart or of materially prejudicing an adjudicative proceeding.

C.  Actual Prejudice vs. Substantial Likelihood of Prejudice.

In concluding that Respondent had committed no misconduct, the hearing officer considered highly relevant his finding that the Commission made no showing that any of the criminal defendants suffered actual prejudice from the statements at issue.  The rules at issue, however, do not require a finding that an otherwise improper statement cause **actual prejudice** to a criminal defendant or to an adjudicative proceeding.  Rather, Rule 3.6(a) requires "**a substantial likelihood** of materially prejudicing an adjudicative proceeding," and Rule 3.8(f) requires "**a substantial likelihood** of heightening public condemnation of the accused." (Emphasis added.)  Even if the passage of time, preventative measures by the trial court, and other factors prevent actual prejudice from occurring in a particular case, it does not necessarily mean that a prosecutor's statements did not meet the "substantial likelihood" standard when made.   In considering the propriety of a prosecutor's extra-judicial statement, the court determines the likelihood that a particular statement will cause prejudice at the time made, not whether, in hindsight, it actually worked to the detriment of a defendant.  *See* Attorney Grievance Committee v. Gansler, 835 A.2d 548, 571 (Md. 2003).

The following types of statements are rebuttably presumed to have a substantial likelihood of materially prejudicing an adjudicative proceeding under Rule 3.6(d):

> ➢ Statements concerning the character, credibility, reputation or criminal record of a suspect in a criminal investigation.

> ➢ Statements concerning the performance or results of any examination or test or the identity or nature of physical evidence expected to be presented.

> ➢ Any opinion as to the guilt or innocence of a defendant or suspect in a criminal case.

> ➢ The fact that a defendant has been charged with a crime unless there is included a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

Rule 3.6 applies to all attorneys, not just to prosecutors. *See* Matter of Litz, 721 N.E.2d 258 (Ind. 1999) (defense attorney reprimanded for statements in letter published in newspapers). Rule 3.8(f) "supplements Rule 3.6 . . . .  In the context of a criminal prosecution, a prosecutor's extrajudicial statement can create the additional problem of increasing public condemnation of the accused."  Prof. Cond. R. 3.8, cmt. [5].  "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."  Prof. Cond. R. 3.8, cmt. [1].   A prosecutor's opinion of guilt is particularly likely to create prejudice, given that his or her words carry the authority of the government and are especially persuasive in the public's eye.  *See* Gansler, 835 A.2d at 572.

Although we defer to the hearing officer's finding the Commission did not offer clear and convincing evidence that Respondent made the statements alleged in Count 1, for future guidance we note that a large part of alleged statements are of the type rebuttably presumed to have a substantial likelihood of materially prejudicing an adjudicative proceeding under Rule 3.6(d).   Regarding Count 2, we note that the press release did not include the required explanation that a charge is merely an accusation and that the defendant is presumed innocent until proven guilty, and much of the undisputed statements Respondent made in the press release are also of the type rebuttably presumed to have a substantial likelihood of materially prejudicing an adjudicative proceeding.  We find nothing in the record to rebut this presumption in this case.

D.  "Safe Harbor" for Information Contained in a "Public Record."

Professional Conduct Rule 3.6(b)(2) provides:  "Notwithstanding paragraph (a), a lawyer may state . . . .  information contained in a public record."  The hearing officer concluded that the several of Respondent's alleged statements concerning the Mendenhall case would fall within this "safe harbor," reasoning:

> ➢ "**Media reports** from other states about the Mendenhall case were accessible on the Internet.  Respondent searched the Internet for news stories about Mendenhall

8

because Respondent himself had little information about the multi-state investigation into the suspected slayings."

> "Mendenhall's alleged use of a .22 caliber handgun in his murders was **publicly documented** and available as early as October 2007, six months prior to Respondent's press conference. The **probable cause affidavit** filed in the Marion County case discusses Mendenhall's suspected killings in other jurisdictions, and states that 'the evidence found in his truck including a .22 caliber weapon, all point to Mendenhall as the killer.'"

> "The statements . . . concerning DNA analysis, plastic wrap and a .22 caliber handgun refer to **information previously documented in the media. The Probable Cause Affidavit** . . . discusses the .22 caliber gun, the DNA testing and the law enforcement officials' discovery of such a large amount of blood that they were able to determine that Ms. Purpura was no longer alive. Thus, these statements were based on **publicly available information** and protected by the safe harbor provision in Rule 3.6(b)."

Hearing Officer's Report at 5-7, 13 (emphasis added, record citations omitted).

Media accounts. In Gansler, a prosecutor charged with making a number of improper public statements about several murder defendants argued that some of the statements fell within the public record safe harbor. Because there was no settled definition of "public record," the high court of Maryland construed the phrase as broadly as possible to statements made prior to its opinion. Thus, it found the prosecutor's statements of information in media reports and in police charges to be within the Rule 3.6(b)(2) safe harbor. However, the court determined that in the future, the phrase "public record" would refer only to public government records, i.e., the records and papers on file with a government entity to which an ordinary citizen would have lawful access. *See* 835 A.2d at 567-69.

We agree with the definition of "public record" set forth in Gansler, with the proviso that "on file" does not mandate such formalities as file stamping or entry on a case docket. A more expansive concept of a public record that includes the unfiltered and untested contents of all publicly accessible media would permit the public record safe harbor to swallow the general rule of restricting prejudicial speech.

9

Probable cause affidavit. A probable cause affidavit falls under the Gansler definition of "public record" so long as it is on file with a government entity to which an ordinary citizen has lawful access. *Cf.* Muex v. State, 800 N.E.2d 249 (Ind. Ct. App. 2003) (no cogent argument supported assertion that prosecutor violated Prof. Cond. R. 3.6 and 3.8. by public disclosure of DNA test results contained in probable cause affidavit). However, Gansler held, and we concur, that to receive the protection of the public record safe harbor, a lawyer may not provide information beyond quotations from or references to the contents of the public record. *See* 835 A.2d at 569. Moreover, we hold that a prosecutor must make clear that what is being disclosed is, in fact, the contents of the probable cause affidavit or other identified public document so the statements cannot be misunderstood to be the prosecutor's own opinion about the evidence or the suspect's guilt.

With regard to the Mendenhall case, some of the alleged statements corresponded to the contents of the probable cause affidavit, but the alleged statements did not make clear that this information was from the probable cause affidavit as opposed to a personal assessment of the matters.

With regard to the press release about the Turner and Stewart cases, Respondent began by referencing the probable cause affidavit, but it is unclear where the content of the affidavit ended and Respondent's own assessment of the matters began. The transition certainly occurred by the time Respondent stated: "I would not trade all the money and drugs in the world for the life of one person, let alone seven."

E. Other "Safe Harbors" and Permitted Statements.

Professional Conduct Rule 3.6(b)(2)'s list of "safe harbors" reads in full:

Notwithstanding paragraph (a), a lawyer may state:

(1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved;

(2) information contained in a public record;

(3) that an investigation of a matter is in progress;

10

(4)  the scheduling or result of any step in litigation;

(5)  a request for assistance in obtaining evidence and information necessary thereto;

(6)  a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

(7)  in a criminal case, in addition to subparagraphs (1) through (6):

(i)  the identity, residence, occupation and family status of the accused;

(ii)  if the accused has not been apprehended, information necessary to aid in apprehension of that person;

(iii)  the fact, time and place of arrest; and

(iv)  the identity of investigating and arresting officers or agencies and the length of the investigation.

In addition, Rule 3.8(f) permits a prosecutor to make "statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose," even if they might heighten public condemnation of the accused. "Although the announcement of an indictment, for example, will necessarily have severe consequences for the accused, a prosecutor can, and should, avoid comments which have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium of the accused." Prof. Cond. R. 3.8, cmt. [5].  The inevitable negative consequences are why the announcement of the fact that a defendant has been charged with a crime is presumptively prejudicial unless accompanied by a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty. *See* Prof. Cond. R. 3.6(d).

We do not fault Respondent or any prosecutor for wanting to share with the public information on the prosecution of serious crimes of great interest in the community.

> It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. . . .  On the

other hand, there are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

Prof. Cond. R. 3.6, cmt. [1]. In the cases at issue, there is no evidence that any of Respondent's statements were meant to serve such law enforcement purposes as protecting potential victims or apprehending suspected perpetrators still at large. Some of the information Respondent provided could have been properly communicated if framed within any of the "safe harbors" listed in Rule 3.6(b). We conclude that in performing his important responsibility of apprising the public of the activities of his office, Respondent stepped beyond the bounds permitted by Rules 3.6 and 3.8.

F. Violations and Discipline.

We accept the hearing officer's finding that the Commission failed to present clear and convincing evidence that Respondent actually made the statements alleged in Count 1. Although we have addressed the contents these alleged statements for guidance in future cases, we find in favor of Respondent on the charges of Count 1.

With respect to Count 2, to the extent that Respondent was repeating information in media accounts and the probable cause affidavit, we give him the benefit of a broad interpretation of the public record safe harbor, although the narrower interpretation set forth above will be applied to future statements. Some of Respondent's statements, however, fall well outside even these parameters, including the statements that Respondent would not trade all the money and drugs in the world for the life of one person, let alone seven, that Turner deserved the ultimate penalty for this crime, that the evidence was overwhelming, and that it would be a travesty not to seek the death penalty. We conclude that when these statements were made, Respondent knew or reasonably should have known that they would have a substantial likelihood of (a) materially prejudicing an adjudicative proceeding in the matter and (b) heightening public condemnation of the accused, and thus violated Professional Conduct Rules 3.6(a) and 3.8(f).

Respondent has no disciplinary history. At the time he made the statements at issue, there was little precedent in Indiana or elsewhere defining the limits of Rules 3.6(a) and 3.8(f). We conclude that a public reprimand is appropriate for Respondent's violation of these rules.

### III.  Conclusion

The Court concludes that Respondent violated Indiana Professional Conduct Rules 3.6(a) and 3.8(f) by making public statements as a prosecutor that had a substantial likelihood of materially prejudicing an adjudicative proceeding and a substantial likelihood of heightening public condemnation of the criminal defendants. For Respondent's professional misconduct, the Court imposes a public reprimand.

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d). The Clerk is further directed to post this opinion to the Court's website, and Thomson Reuters is directed to publish a copy of this opinion in the bound volumes of this Court's decisions.

All Justices concur.