2012 UT 21

**In the Matter of the DISCIPLINE OF Clayne I. COREY.**

No. 20100955.

Supreme Court of Utah.

March 27, 2012.

Charles A. Gruber, Sandy, for respondent.

Adam C. Bevis, Billy L. Walker, Salt Lake City, for petitioner.

Justice LEE, opinion of the Court:

¶ 1 Clayne Corey used his client's settlement money to cover his firm's operational expenses for four months. After depleting the funds, he tried to persuade his client that she should place her money in a trust account to be distributed in small, monthly installments. After this plan failed, Corey asked his client to sign a promissory note for

the outstanding balance, listing his law firm as the borrower. She refused to sign the note and later demanded the remaining balance of what she was owed. Corey failed to repay the already-exhausted funds.

¶ 2 Following a civil suit to recover the missing money, the Office of Professional Conduct (OPC) initiated this disciplinary action. After months of litigation the district court concluded that, based on Corey's lack of intent to injure his client, the presumptive discipline was suspension rather than disbarment. The court suspended Corey but stayed the suspension, finding mitigating evidence and expressing an interest in facilitating restitution to Corey's client. OPC appealed, arguing the presumptive discipline should have been disbarment. We agree and reverse.

## I

¶ 3 Law school chums Clayne I. Corey and Randall Lund formed the law firm of Corey & Lund in 1999. In June of that year, Maxine Stager retained Corey & Lund to represent her in a personal injury case. Her fee agreement with the firm provided for a fee of 33.3 percent of any settlement reached. In February 2000, Stager accepted a settlement offer of $122,500.00. Stager received a check from the insurance company that was made out to both her and Corey. Some days later, the entirety of Stager's settlement award was deposited into Corey's operating account instead of his client trust account.

¶ 4 Corey knew that Stager's funds had been deposited into the operating account, but as the exclusive signatory authority on the account he continued to write checks against the balance. Within a matter of weeks the operating account was all but drained, plummeting from a balance of $128,916.14 in February 2000, to only $2,909.12 by the end of June of that year.

¶ 5 In June 2000, Corey began sending monthly payments of $500 to Stager. Later that summer, after the funds had been depleted from the operating account, Corey and Lund arranged a meeting with Stager to discuss a proposed new strategy. To protect both her settlement money and her social security benefits, they suggested that she establish a special needs trust. During this meeting, Corey intimated to Stager that, by preserving her settlement funds in a trust that paid her in monthly installments, she could continue to preserve her right to receive social security insurance benefits. Corey did not take this opportunity, however, to inform Stager that her settlement funds had already been exhausted. Apparently persuaded by the wisdom of protecting her benefits, Stager consented to her funds being placed in a trust.

¶ 6 Although she initially agreed to Corey's proposed trust scheme, Stager never signed any trust documents. No trust was ever established or funded. Some weeks later, at an August 2000 meeting with both Corey and Lund,[1] Stager was asked to sign a Promissory Note dated April 20, 2000. The note listed Corey & Lund as the borrower and Stager as the lender for a loan in the amount of $55,173.20 (plus seven percent interest). Stager declined to sign the note.

¶ 7 Eventually Stager requested the full amount of her settlement, including an accounting of the funds and her file. Corey did not produce the funds, the accounting, or Stager's file. Of her settlement funds to that point, Stager had received twenty-one payments of $500 from Corey, totaling $10,500. Corey also paid $20,368.44 toward Stager's medical liens. According to their fee arrangement, Corey was entitled to $40,995.90 of the settlement funds. Stager brought suit against Corey to recover the balance of her settlement money, some $50,371.21, plus interest.

¶ 8 Upon the resolution of that suit, OPC initiated this disciplinary action against Corey in June 2009. After more than a year of litigation, the district court conducted a hearing in September 2010 to determine whether and to what degree to sanction Corey. At the hearing, Corey presented evidence that he had developed a non-cancerous, arachnoid

---

1. Corey tape-recorded this meeting, apparently due to his concern that Lund wasn't following through on the creation of the trust. Lund was charged with nine felony counts in April 2000 in Third District Court. He has been on the lam ever since.

cyst in his brain, which was discovered and removed in June 2009. Although Corey had complained of frequent and severe headaches years earlier in 2001, a CT scan performed at that time revealed no visible cyst, no abnormal fluid collection, and no remarkable variations in ventricle size or configuration. Corey argued that the seeds of the cyst had been sown as early as his childhood and that it had substantially contributed to his misconduct with Stager and other clients.

¶ 9 The district court also heard evidence that between 2001 and 2009, Corey had been diagnosed with anxiety or bipolar disorder and began a regiment of benzodiazepines to treat his symptomatic migraine and tension headaches. In 2008, Corey overdosed on Xanax and as a result began seeing a psychiatric physician, Dr. Jason Lee Anderson. It wasn't until early 2009, when Corey experienced slurred speech and blurred vision, that Dr. Anderson referred him to other specialists for treatment and ordered an MRI, which revealed the one-inch cyst.

¶ 10 Dr. Anderson testified at the sanctions hearing. Among other things, he testified that, in his opinion, the combination of treatment-induced dependency on benzodiazepines and the arachnoid cyst could have contributed to Corey's misconduct. Specifically, Dr. Anderson stated that he believed a cyst in the same location as Corey's could contribute to headaches and mood swings, and that he felt "whatever ... underlying mood disorder [Corey had] ... was exacerbated by the benzodiazepine abuse," and that "in retrospect [he] believe[d] the cyst was contributory." During his testimony, however, Dr. Anderson conceded that the brain functions most relevant to Corey's misconduct—concerning organizational skills, cognitive understanding, and the ability to deal with issues—were generally understood to "[be] more in the frontal lobe area," opposite of the location of Corey's cyst.

¶ 11 After the sanctions hearing, the district court made several findings, some centered on the cyst in Corey's brain. The district court found Dr. Anderson's testimony particularly persuasive, concluding that it was both "very credible" and "uncontroverted." Based on this testimony, the court found that the seeds of the cyst had been "present since before [Corey's] birth," and that beginning as early as 1993 its presence in the brain affected Corey "in a number of ways," causing headaches, stress, poor judgment, mood swings, impulsive behavior, and memory problems. With all this in mind, the court found that during his representation of Stager, Corey's treatment-induced dependencies, together with the cyst, causally "contributed to [his] behavior and deviation from the standard of care."

¶ 12 Given this set of facts, the district court found that Corey had violated five Rules of Professional Conduct during his representation of Stager: 1.15(a) (safekeeping property), 1.15(b) (safekeeping property), 1.15(c) (safekeeping property), 1.16(d) (declining or terminating representation), and 8.4(a) (misconduct). But in light of what it deemed a lack of intent on Corey's part, the court concluded that the presumptive sanction against Corey was suspension rather than disbarment or reprimand.

¶ 13 Contrasting Rules 14–605(a),[2] 14–605(b)(1),[3] and 14–605(c)(1),[4] and citing a number of our precedents in this field,[5] the court determined that Corey's was "[a]t best ... a case of mixed knowledge and negligence." Although Corey knew Stager's

---

**2.** SUP. CT. R. PROF'L PRACTICE 14–605(a)(1) (presuming disbarment where a lawyer "knowingly engages in professional misconduct ... *with the intent to benefit the lawyer or another or to deceive the court,* and causes serious or potentially serious injury to a party, the public, or the legal system" (emphasis added)).

**3.** *Id.* 14–605(b)(1) (presuming suspension where a lawyer "knowingly engages in professional misconduct ... and causes injury or potential injury to a party, the public, or the legal system").

**4.** *Id.* 14–605(c)(1) (presuming reprimand where a lawyer "negligently engages in professional misconduct ... and causes injury to a party, the public, or the legal system").

**5.** *In re Discipline of Ennenga,* 2001 UT 111, 37 P.3d 1150; *In re Discipline of Johnson,* 2001 UT 110, 48 P.3d 881; *In re Discipline of Babilis,* 951 P.2d 207 (Utah 1997).

funds had been deposited into the operating account, was writing checks against that account, and knew or should have known that Stager's funds "were not being kept safe," the court determined that Corey's "knowledge was not accompanied by the intent that Ms. Stager be deprived of her funds or that [they] be used to personally benefit himself or someone [else]."

¶ 14 In support of the conclusion that suspension was the presumptive discipline, the district court determined that Corey "did not *intend* to cause harm or injury," suggesting that the "evidence show[ed]" that Corey in fact "intended to protect" Stager by doling out her settlement piecemeal, thereby maintaining the status quo of her SSI benefits. (Emphasis added.) As to Corey's failure to establish a trust or protect Stager's benefits, the court deemed Corey's acts not intentional but "the result of [his] negligence."

¶ 15 The court noted, moreover, that unlike typical attorney misappropriation cases "there [was] no evidence regarding the fate of Ms. Stager's settlement funds." Likewise, there was no evidence presented to indicate that Corey "intended to personally benefit" from the funds. Although Corey "likely enjoyed some benefit from the funds" through their use for business expenses, the court concluded that there was no evidence of wrongful intent, a fact that in its view "remove[d] the case" from a presumption of disbarment under 14–605(a) to one of suspension under 14–605(b)(1).

¶ 16 With this presumption in mind, the court then considered the aggravating and mitigating factors in the case. Among the aggravating factors, the court noted Corey's long history of misconduct and prior discipline.[6] The court also highlighted Corey's "pattern of carelessness relating to the safekeeping of client funds" and the decade of practice he already had under his belt by the time he took on Stager's case. Worst of all, the court determined, was Corey's utter failure to make even a "good faith effort to make restitution to Ms. Stager."[7]

¶ 17 As for mitigating evidence, the court was impressed by the potential effect of Corey's arachnoid cyst on his cognitive functions. Together with his prescribed medications, the court concluded that the "cyst causally contributed to Mr. Corey's behavior that resulted in the rules violations in this case," and that Corey suffered from a mental impairment. As evidence of further mitigation, the court observed that "Dr. Andersen [sic] has observed a very good recovery by Mr. Corey, including a return to full mental capacity." The court also noted that, since the effects of Corey's cyst and medications had existed since "at least 1993 ... the mitigating effect of [his] mental disability largely negate[d] any aggravation caused by his prior disciplinary record."

¶ 18 In conclusion, the court decided that Corey's mental impairment had a "large mitigating effect," but nonetheless suspended Corey in light of the fact that he had not paid back any of Stager's outstanding funds for several years. With Stager's financial hardship in mind, however, the court felt it important that Corey make restitution to her, and accordingly stayed Corey's suspension to facilitate that restitution.

¶ 19 OPC now appeals Corey's suspension, arguing that it was "contrary to established law." OPC urges us to conclude that "the presumptive sanction for Corey's misconduct ... was disbarment."[8] For his

---

**6.** The court noted that Corey's prior discipline included a formal suspension from the Bar in 1993 for violating rule 1.13(b) of the Utah Rules of Professional Conduct, related to the use of a client trust account. In conjunction with this suspension, Corey had been ordered "to obtain an opinion from a mental health professional regarding his fitness to practice law, ordered to pay restitution to twelve clients, and placed on supervised probation" for another year. The court also listed a slew of other prior disciplinary matters—violations of rule 1.16(d) (termination of representation) and rule 1.5 (fees) in April 2002; a public reprimand in May 2005 for viola-tion of rule 8.4(b) (for misconduct related to a DUI); and admonishments in 2005 for violations of rule 1.1 (competence), rule 1.15(b) (safekeeping property), and rule 8.1(b).

**7.** In its findings, the court observed that, although Corey "state[d] that he fe[lt] a moral obligation to pay Ms. Stager," he had "not made any payments to [her] since she terminated his representation in 2004."

**8.** OPC also argues that the district court erred when it "treated Dr. Anderson's testimony as an expert opinion, [when] Dr. Anderson was not

part, Corey contends that his suspension was appropriate, arguing that he "did not have the requisite intent for intentional misappropriation." Corey offers two reasons why the district court applied the correct presumption: (1) there was no proof offered that he "intentionally set about stealing Ms. Stager's funds for his own use" or that he "received any of Ms. Stager's funds for his own personal use"; and (2) Corey's "organic brain disease" was "such a compelling and significant mitigating circumstance . . . [that it] casually [*sic*] contributed to his poor judgment and inability to appropriately manage his law firm and bank accounts."

¶ 20 We disagree on both counts. For the reasons below, we reverse the district court and conclude that Corey should be disbarred for intentional misappropriation of Stager's funds. We first hold that Corey's acquisition and use of Stager's funds for the operational needs of the firm was knowing and intentional, thereby placing him squarely under a presumptive disbarment standard. Second, we hold that Corey's mental impairment does not represent truly compelling mitigation evidence sufficient to rebut the presumption of disbarment. We accordingly reverse and order that Corey be disbarred.

## II

■ ¶ 21 As even Corey concedes, the presumptive discipline for the intentional misappropriation of client funds is disbarment.[9] Corey contends, however, that his case is distinguishable from our prior misappropriation cases, in that they all dealt with attorneys who "intentionally stole funds from [their] client or firm" and "knew [they were] stealing money and had a specific need for the money [they] stole."[10] Corey's distinction therefore lies in his novel notion that, although he *knew* he had stolen his client's funds and used them to cover his operational expenses, he did not *intentionally* steal the money for a specific need. This line is untenable and we decline to draw it.

■ ¶ 22 A disciplinary court presumes disbarment when a lawyer "knowingly engages in professional misconduct . . . with the intent to benefit the lawyer or another . . . and causes serious or potentially serious

qualified to testify as an expert" under rule 26(a)(4) of the Utah Rules of Civil Procedure and rule 702(a) of the Utah Rules of Evidence. OPC's complaint appears to be based on Dr. Anderson's testimony on the issue of causation. After a review of the record, however, we conclude that OPC invited the error, if any was made.

At the sanctions hearing, OPC objected to what it felt was inappropriate "expert testimony" from Anderson, but that objection was overruled. OPC did not press the issue further. In fact, OPC later opened the door for Anderson to testify regarding causation—an area OPC deems to be relegated solely to experts. *But see Drew v. Lee*, 2011 UT 15, ¶ 31, 250 P.3d 48 (holding that under rules of civil procedure, treating physicians don't need to file expert reports "even if those physicians are testifying about causation and future prognosis"). On cross-examination, counsel for OPC asked Anderson whether he believed Corey's condition (and the presence of a cyst) could have caused him to behave in such a way that he would misappropriate Stager's funds. In something of a role reversal, Corey's counsel objected to Anderson's statements as misrepresenting the facts of the case, which the district court sustained.

Under these circumstances, we conclude that any alleged error in allowing Dr. Anderson to testify as an expert was invited by OPC. The doctrine of invited error prevents a party from taking "advantage of an error committed at trial when that party led the trial court into committing the error." *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 12, 163 P.3d 615 (internal quotation marks omitted). When the complaining party invites the alleged error, we decline "to engage in even plain error review." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171. By asking Dr. Anderson to opine on the subject of causation, OPC opened the door to the very kind of expert testimony it now complains of. Because OPC invited this error itself, we decline to engage in any further review of this issue.

9. *See* Sup. Ct. R. Prof'l Practice 14–605(a)(1); *id.* 14–605(a)(3); *see also In re Discipline of Babilis*, 951 P.2d 207, 217 (Utah 1997).

10. *See In re Discipline of Ennenga*, 2001 UT 111, ¶ 3, 37 P.3d 1150 (attorney misappropriated client's funds collected from a debtor and used them for "personal expenses"); *In re Discipline of Ince*, 957 P.2d 1233, 1234–35 (Utah 1998) (attorney used funds from firm's client trust account to purchase and make payments on a dream home for his wife); *In re Discipline of Babilis*, 951 P.2d at 209 (attorney misappropriated client funds by withdrawing approximately $36,000 from client trust account for "personal" expenses, including a trip to Wisconsin to "inspect a houseboat" he planned to purchase).

injury to a party."[11] When a lawyer knowingly engages in professional misconduct *without* the intent to benefit himself or another, however, the presumptive sanction is merely suspension.[12] Generally, our rule is that "intentional misappropriation of client funds will result in disbarment unless the lawyer can demonstrate truly compelling mitigating circumstances." *In re Discipline of Babilis*, 951 P.2d at 217 (internal quotation marks omitted).

¶ 23 The district court concluded that Corey's misconduct was carried out under some kind of hybrid mental state— "mixed knowledge and negligence"—and that Corey thus lacked the requisite intent to benefit from Stager's settlements funds. Although Corey was aware of the actions he took, the court found that there was no evidence regarding the fate of the funds or that Corey intended to or did personally benefit from the money. But these findings are not supported by the record,[13] nor is the precise fate of the funds (beyond the fact that they were not given to the client) material to the intent inquiry.

¶ 24 The line between knowledge and intent is clearly demarcated in the Rules of Professional Conduct. "Intent" is defined as "the conscious objective or purpose to accomplish a particular result."[14] "Knowledge," on the other hand, is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious object or purpose to accomplish a particular result."[15]

¶ 25 Under these defined terms, Corey clearly intended to benefit himself. Corey concedes that he knew that Stager's funds had been deposited into the firm's operational account rather than a client trust account. And he does not assert that he misdeposited Stager's funds or that he unwittingly drew against his newly inflated operational account. Corey was aware that the settlement funds were located in the firm's operational account, just as he was aware that the funds significantly increased the account balance. Corey therefore knew that every time he drew a check against that account balance, he was using his client's funds to cover firm expenses. Moreover, Corey was the only signatory authorized to draw checks against the firm's operational account, and in a period of approximately four months he spent the entirety of Stager's remaining funds.

¶ 26 The only logical inference that can be drawn from these facts is that Corey alone drew the checks, exhausted the funds, and in doing so used the money for some purpose known only to him. Corey obviously intended to use the operational account—with Stager's funds providing the bulk of the balance—to cover business or other expenses.[16]

---

11. Sup. Ct. R. Prof'l Practice 14–605(a)(1); *see also id.* 14–605(a)(3) (presuming disbarment when a lawyer "engages in any other intentional misconduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law").

12. *See id.* 14–605(b).

13. Because matters of attorney discipline are governed by Supreme Court rule, *see* Utah Const. art. VIII, § 4, we employ a unique standard of review in such cases. *See In re Discipline of Babilis*, 951 P.2d at 213. While we will "ordinarily presume findings of fact to be correct and will not overturn them unless they are arbitrary, capricious, or plainly in error," we accord them less deference in matters of attorney discipline. *Id.* (internal quotation marks omitted). If those findings are "not supported by the evidence" we may set them aside entirely. *Id.* (internal quotation marks omitted). Furthermore, we "reserve the right to draw inferences from basic facts which may differ from the inferences drawn by the lower tribunal." *Id.* (alteration and internal

quotation marks omitted). "Although we recognize as a general proposition the district court's advantaged position in overall familiarity with the evidence and the context of the case, on appeal we must treat the ultimate determination of discipline as our responsibility." *Id.*

14. Sup. Ct. R. Prof'l Practice 14–601(e).

15. *Id.* 14–601(f).

16. At oral argument, counsel for Corey also suggested that Corey's lack of motive to hurt Stager supported the notion that he did not intend to benefit from his actions. This theory likewise misses the mark. A lawyer's lack of motive to injure his client is irrelevant to the intent inquiry.

Rule 14–605(a)(1) requires only that the professional misconduct be aimed at benefitting the attorney or another. *Id.* That misconduct must, in turn, cause serious or potentially serious injury. *Id.* Accordingly, the intent inquiry focuses not on whether the attorney intended to injure

¶ 27 Corey suggests that his behavior was unintentional in part because there was no proof as to how exactly he used the money—whether it was spent in the service of his own personal whims or to pay his firm's operating expenses. But such proof is unnecessary. A lawyer's use of client funds is intentional whether the money is spent on a new Harley, food for orphans, or the quills and ink for his firm. In any case, the effect is the same—counsel has knowingly stolen his client's funds with the intent to spend that money in a manner chosen by him and not the client.

¶ 28 We therefore conclude that Corey's misconduct during his representation of Stager was done with the intent to benefit himself and resulted in serious injury to Stager. Accordingly, we hold that the presumptive sanction is disbarment, a presumption that can be overcome only by "truly compelling mitigating circumstances." *In re Babilis*, 951 P.2d at 217. As we discuss below, Corey's mental impairment—although perhaps exacerbated by mental, physical, and pharmaceutical factors—was not so compelling a mitigating circumstance as to overcome this presumption.

### III

¶ 29 We review Corey's misconduct under a presumption of disbarment. We therefore defer to the district court's findings of fact where they are supported by the record, but draw our own inferences from "basic facts which may differ from the inferences drawn by the lower tribunal." *In re Discipline of Babilis*, 951 P.2d 207, 213 (Utah 1997) (alteration and internal quotation marks omitted); *see also supra* ¶ 23 n. 13. In order to "overcome the presumption of disbarment, the ... mitigating factors must be significant. In fact, they must be truly compelling." *In re Discipline of Ennenga*, 2001 UT 111, ¶ 10, 37 P.3d 1150 (internal quotation marks omitted).

¶ 30 The district court based its decision to stay Corey's suspension largely on what it deemed the crucial mitigating factor—the ar-

achnoid cyst in Corey's brain. For the district court, the "cyst and the medications prescribed ... causally contributed" to Corey's misappropriation of Stager's funds. The court concluded that "the effects of the cyst and medication, including headaches, mood swings, poor judgment, etc., constitute a mental impairment that had a significant effect on Mr. Corey." In examining Corey's extensive disciplinary past, the court also determined that the mitigating effect of Corey's "mental disability largely negate[d] any aggravation caused by his prior disciplinary record." Finally, the court was impressed by Corey's remarkable recovery since removal of the cyst, and concluded that this factor weighed in favor of mitigation.

¶ 31 We are not persuaded that the record sustains the conclusion that Corey's cyst, together with his doctors' misdiagnoses and overmedication, caused or contributed to his prior misconduct or his dealings with Stager. Likewise, we see nothing in the record to suggest an impressive recovery following removal of the cyst. Thus, we conclude that the record does not establish a "truly compelling" case of mitigation sufficient to rebut the presumption of disbarment. Accordingly, in light of the remaining aggravating factors, we conclude that Corey should be disbarred.

### A

¶ 32 Turning first to Corey's past discipline and his representation of Stager, we conclude that his history of misconduct related to client representation and trust accounts is deeply troubling. Beginning as early as 1993, Corey exhibited a willingness to flout the Rules of Professional Conduct and continue to act in a way that was unbefitting a member of the Bar. *See supra* ¶ 16 n. 6.

¶ 33 Although Corey concedes that it is appropriate to bring his past misconduct out into the light, he insists that there is a medical explanation for "his first discipline in the early 1990s and likely most, if not all, of the other discipline." Corey cites to Dr. Anderson's "unrebutted medical testimony at

his client through his misconduct, but rather whether he intended to benefit himself or another through it.

the sanctions hearing" as evidence of the causal connection between Corey's cyst, history of misdiagnoses and overmedication, and "erratic behavior." In our view, however the record does not sustain this conclusion.

¶ 34 At the sanctions hearing, Dr. Anderson did testify that Corey's cyst could have impaired Corey's judgment and memory and may have made him more aggressive and impulsive. Dr. Anderson also testified that he believed the effects of a cyst like Corey's could affect other areas of the brain through swelling and tissue displacement. But when pressed to declare whether there was a direct causal relationship between the loss of Stager's funds and Corey's cyst and medication use, Dr. Anderson stated that he could not answer "yes or no" without knowing more details. Dr. Anderson also conceded that the brain functions most relevant to Corey's misconduct were generally understood to "[be] more in the frontal lobe area," far from the location of Corey's cyst.

¶ 35 We therefore view Anderson's testimony as, at best, a theoretical discussion of how Corey's cocktail of medications and brain disease—together with the stress from Lund's criminal behavior, alcoholism, and other behavioral issues—*could* have contributed to his professional misconduct and specifically his misappropriation of Stager's settlement funds. This is hardly the sort of persuasive showing necessary to establish "truly compelling" mitigation evidence.

¶ 36 The timing of the cyst and medication likewise weighs against any mitigation of Corey's prior discipline and actions here. The cyst was not found in a 2001 CT scan and Corey did not start taking Xanax until "early

2000." Given that Corey deposited the settlement check in February 2000—nearly a decade before the cyst was ever discovered— we find no basis to sustain the conclusion that his mental impairment caused or substantially contributed to his misconduct some ten to sixteen years earlier.

¶ 37 Even if the seeds of Corey's cyst had been planted from before childhood, there is simply no evidence before us that the cyst existed or significantly impaired Corey's cognitive abilities when he took on Stager's case. There is, moreover, no evidence to suggest that Corey's impairment would have prevented or did prevent him from developing the requisite intent to misappropriate Stager's funds for his own benefit. In light of Dr. Anderson's ambiguous conjecture about what could have caused Corey's misconduct years before his treatment, this is not the kind of "truly compelling" mitigating evidence that would rebut the presumption of disbarment.[17]

### B

¶ 38 We turn now to the aggravating factors in this case. Of these factors, the district court initially regarded two as mitigating, but we consider both to be aggravators. First, the district court concluded that Corey and Lund's attempt to persuade Stager that she needed to establish a trust to protect both her settlement funds and the status of her SSI benefits was a point in favor of mitigation. We note, however, that at the time they met with Stager, her settlement funds had already been spent—a fact they concealed from her. That Corey later tried to get Stager to sign a promissory note cast-

---

17. We are not closing the door on the possibility that in a future case mental health issues might rise to the level of "truly compelling" mitigation. If an attorney with a sparkling record of professionalism developed a mid-career brain tumor, engaged in out-of-character misconduct thereafter, and returned to his sterling past self after treatment, that could certainly sustain a finding of compelling mitigation sufficient to rebut a presumption of disbarment.

This is not such a case, however. Corey's long history of client trust fund issues and other bar discipline, together with Dr. Anderson's vague speculation regarding causation and Corey's subsequent failure to repay Stager, all undermine the supposedly compelling nature of Corey's mit-

igating circumstances. Such a speculative and tenuous causal link between mental health and misconduct simply cannot support a finding of compelling mitigation. If we were to accept Corey's case for mitigation, we would risk allowing the narrow exception to trample the general rule in a parade of disbarred attorneys who could speculate that their history of substance abuse or mental impairment could have contributed to their bad behavior. Not all such circumstances are truly mitigating; many are simply collateral indications of troubled lives. Thus, while keeping the door open for a truly compelling case of mitigation, we are wary of the risks of an exception that could swallow the rule.

ing her outstanding funds as a loan to the firm only confirms that Corey was racing to cover his tracks. Accordingly, we regard the trust fund scheme and proposed promissory note as convenient cover stories for Corey's misconduct rather than some altruistic plan to protect Stager's money and living condition.

¶ 39 Second, Corey suggests that ever since the removal of his cyst his behavior has been exemplary and ought to be viewed as a point in favor of mitigation. Indeed, the district court found this reasoning compelling, noting that "since surgery to remove the cyst in 2009, Dr. Anderson has observed a very good recovery by Mr. Corey, including a return to full mental capacity." The court went on to observe that Corey "has resumed activity in his religion and feels better than he has in years." Based on this evidence, the court concluded that Corey's recovery "has been demonstrated by [a] meaningful and sustained period of successful rehabilitation."

¶ 40 This remarkable turnaround does not strike us as compelling mitigation evidence, however. It is no surprise that a lawyer faced with disbarment—the proverbial professional death-sentence—has seen the light and changed his ways. Furthermore, although Corey professes that since the removal of his cyst he continues to get better, his actions so far suggest that he feels the same. Corey's failure to repay Stager's funds after more than a decade of holding on to them highlights just how easy it is to excuse his behavior now that he has something to blame. He has had ample time and opportunity to repay the funds owed to Stager, but to date he has given her nothing.

¶ 41 Weighing these aggravating factors against what little mitigation evidence remains leads us to conclude that Corey should be disbarred. Although Dr. Anderson testified that Corey's cyst and pharmaceutical dependencies could have contributed to Corey's misconduct, we do not regard that as the kind of truly compelling mitigation evidence required to rebut the presumption of disbarment.

¶ 42 Accordingly, we order that Corey be disbarred.

Justice LEE Authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice DURHAM, and Justice PARRISH joined.