*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 11**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN THE MATTER OF THE DISCIPLINE OF
ABRAHAM BATES, #12440

UTAH STATE BAR,
OFFICE OF PROFESSIONAL CONDUCT,
*Appellant,*

*v.*

ABRAHAM BATES,
*Appellee.*

No. 20150483
Filed February 22, 2017

On Direct Appeal

Third District, Salt Lake Dep't
The Honorable Todd M. Shaughnessy
No. 120905676

Attorneys:

Todd Wahlquist, Salt Lake City, for appellant

Michael F. Skolnick, Troy L. Booher, Erin B. Hull,
Beth E. Kennedy, Salt Lake City, for appellee

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1   The Utah State Bar's Office of Professional Conduct (OPC) appeals from a final judgment of the Third District Court suspending Abraham Bates from the practice of law for a period of five months for violating rules 1.4(a), 1.15(a), and 1.15(d) of the Utah Rules of Professional Conduct. The OPC asks this court to elevate Mr. Bates'

sanction from suspension to disbarment, by inferring from the district court's factual findings that Mr. Bates acted both "knowingly" and "with the intent to benefit" from his misconduct. We affirm the district court's sanction of suspension, albeit on alternate grounds.

## BACKGROUND

¶2 Just six months after beginning to practice law, Abraham Bates started his own law firm, Wasatch Advocates. Mr. Bates solely owned and operated Wasatch Advocates. Although the firm started with only six employees, its clientele rapidly expanded, and, within a single year, it employed thirty-seven people to meet the growing workload. In order to deal with the increasing expenses, Mr. Bates established lines of credit to maintain enough money in the firm's operating account. He regularly made draws against these lines of credit.

¶3 Although he managed the operating and trust accounts on his own with the assistance of his receptionist in the beginning, the accounting became more complicated as the firm's income and expenses quickly grew. Mr. Bates retained a certified public accountant to perform monthly reconciliations, auditing, and tax work. Later, as the practice expanded, Mr. Bates hired an accounting firm to do more frequent reconciliations and to train Mr. Bates and his staff in accounting procedures. Despite this, he noticed that there were still accounting issues, such as his receptionist mistakenly depositing client money into the operating account and earned fees into the trust account. At the accounting firm's suggestion, a chief operating officer was also hired to help with the firm's accounting practices. However, even after taking these corrective measures, the operation of the firm's accounts remained chaotic.

¶4 In January 2012, Wasatch Advocates imploded due to changing economic circumstances and the abrupt departure of a significant proportion of Mr. Bates' staff. Around the time of the firm's dissolution, John Liti, a former client, filed a bar complaint against Wasatch Advocates resulting in an OPC investigation. During the investigation, the OPC focused heavily on Mr. Bates' accounting practices and identified possible violations in other client matters. The only matter at issue on this appeal is the F.A. Apartments matter. The OPC alleges that Mr. Bates' actions amount to intentional misappropriation of F.A. Apartments' funds and merit disbarment in two different instances: his management of F.A. Apartments' funds held in the trust account and his management of a retainer paid by F.A. Apartments that was held in the operating account.

## I. TRUST ACCOUNT SHORTFALLS

¶5    F.A. Apartments hired Mr. Bates to defend it against a foreclosure. In December 2010, F.A. Apartments gave Mr. Bates $28,000 to be deposited in trust. The $28,000 consisted of rents collected on the property that was the subject of the foreclosure action. The money was to be held in trust during settlement negotiations and was to be used only for property management and other authorized expenses, not for Mr. Bates' attorney fees. Wasatch Advocates deposited the $28,000 into its trust account. Mr. Bates made authorized expenditures out of the trust account and kept detailed records about the remaining balance.

¶6    Despite these accounting efforts, the OPC's investigation revealed that the overall trust account balance dipped below the amount Wasatch Advocates was holding for F.A. Apartments. On three particular days in early 2011—January 3, March 17, and June 30—the balance of Mr. Bates' trust account was less than the amount he should have been holding for F.A. Apartments by $2,001.26, $2,343.98, and $4,221.80 respectively. However, there was enough in the operating account to cover these shortfalls, and his lines of credit also had more than enough to cover these shortfalls.

## II. OPERATING ACCOUNT SHORTFALL

¶7    During the first week of August 2011, F.A. Apartments paid Wasatch Advocates a $16,500 retainer. Despite Mr. Bates' direction that these funds be deposited in the trust account, his staff mistakenly deposited $16,000 of the $16,500 into the firm's operating account without Mr. Bates' knowledge.[1] The retainer was to be used for Mr. Bates' work in the foreclosure action. About three weeks after the money was incorrectly deposited, Mr. Bates was nearing the completion of settlement negotiations for the foreclosure case, with an agreement to settle for $20,000.

¶8    At this point, while conducting a review of the trust account to determine if there was enough of the $28,000 left to cover the settlement, Mr. Bates discovered the $16,000 retainer had been deposited in the operating account, contrary to his instructions. After conducting his review, Mr. Bates knew that F.A. Apartments did not

---

[1] Five members of F.A. Apartments made individual payments to cover the retainer. For reasons unknown, four of those payments totaling $16,000 were deposited into the operating account by Mr. Bates' assistant, despite his instructions to deposit them in the trust account. A few days later, the fifth payment of $500 was received and correctly deposited into the trust account.

have the money to pay the settlement amount. Not wanting his client to lose the favorable settlement, Mr. Bates agreed to defer billing for his work on the matter and to use the retainer funds to pay the settlement, even though he had already earned the bulk of the $16,500 retainer. For reasons that do not appear on the record, Mr. Bates failed to move the money into his trust account at that time, even though he acknowledged that the $16,000 became client funds after the agreement to use the retainer to settle the foreclosure case.

¶9    Approximately four weeks after Mr. Bates learned that the $16,000 had been incorrectly deposited, he made a $20,000 withdrawal from the operating account and transferred it to payroll, leaving a negative balance in the operating account. All of F.A. Apartments' $16,000 was thus transferred to Mr. Bates' payroll account and apparently used for the firm's payroll.

¶10 In the two weeks leading up to the payroll transfer, Mr. Bates made two draws on his lines of credit, and maintained the ability to draw money that "significantly exceeded the amount of the [$20,000] transfer." Three days after the payroll transfer, Mr. Bates took a $5,000 draw on a line of credit and placed the money in his operating account. Two days after that, he took another $7,000 draw. Ten days after the payroll transfer, Mr. Bates wired $20,000 (including the $16,000 retainer) to settle the F.A. Apartments' foreclosure case.

¶11 After the settlement payment, Mr. Bates' representation of F.A. Apartments concluded to the satisfaction of all parties. F.A. Apartments never raised any concerns, even during the disciplinary proceedings, with Mr. Bates' representation or management of its funds.

### III. TRIAL

¶12 After its investigation, the OPC sought Mr. Bates' disbarment, alleging seven violations of the Utah Rules of Professional conduct in connection with five different client matters. Over the course of the trial, the OPC withdrew two of its previous allegations and ultimately asked the court to disbar Mr. Bates based only on his conduct in the F.A. Apartments matter. The district court held that Mr. Bates violated three rules during his representation of F.A. Apartments and the other clients: 1.4(a) (communication), 1.15(a) (safekeeping property), and 1.15(d) (safekeeping property). The court did not hold, however, that Mr. Bates intentionally misappropriated F.A. Apartments' funds.

¶13  Mr. Bates gave the following testimony during trial:

Q: . . . [F]rom December of 2010, the point in time after FA [Apartments] provided the $28,000, up through the end of September 2011 [when the foreclosure case settled] did you ever intend to utilize FA Apartments' funds for any purpose, other than FA Apartments-related expenses?

. . . .

A: No

Q: Thank you. You can explain.

A: I have no knowledge of any check or dollar of FA Apartments' funds from the original $28,000 or the $16,500 being used for any other purpose than on behalf of FA Apartments, and it was certainly not my intent to do so.

Based on this testimony and the circumstantial evidence, the district court held that "the OPC failed to meet[] its burden of showing that Mr. Bates knowingly or intentionally caused the apparent shortfalls" in the trust account, and, therefore, that Mr. Bates was negligent in managing his trust account. The operating account shortfall was held to be knowing but without "the specific intent to use F.A. funds to benefit himself, another, or harm F.A. [Apartments]."

¶14 In the end, the court held that all of Mr. Bates' violations, except the shortfall in the operating account, were committed negligently. Because it held that Mr. Bates knowingly caused the shortfall in the operating account, but without the intent to benefit himself, the court determined that the presumptive sanction was a six-month suspension.[2] It then applied a balancing test of the aggravating and mitigating factors, resulting in a slight reduction to a five-month suspension.

¶15 On appeal, the OPC argues that the district court erred in holding that the trust account shortages were negligent, with a presumptive sanction of reprimand, and that the payroll transfer was knowing but without an intent to benefit himself, with a presumptive sanction of suspension. The OPC argues that Mr. Bates

---

[2] It held that the presumptive sanction in three of the matters was a private admonition and that in one of the matters, a public reprimand was the presumptive sanction. The F.A. Apartments matter was the only matter in which the court held that suspension was the presumptive sanction.

intentionally misappropriated those funds, and the presumptive sanction should therefore be disbarment.

¶16 Jurisdiction is proper in this matter pursuant to Utah Code section 78A-3-102(3)(c).

## STANDARD OF REVIEW

¶17 This court has the constitutional authority to "govern the practice of law, including . . . the conduct and discipline of persons admitted to practice law." UTAH CONST. art. VIII, § 4. Given our "constitutional mandate[,] 'the unique nature of disciplinary actions and our knowledge of the nature of the practice of law,'" we apply a somewhat modified standard of review. *In re Discipline of Babilis*, 951 P.2d 207, 213 (Utah 1997) (citation omitted). "While we will 'ordinarily presume findings of fact to be correct and will not overturn them unless they are arbitrary, capricious, or plainly in error,' we accord them less deference in matters of attorney discipline." *In re Discipline of Corey*, 2012 UT 21, ¶ 23 n.13, 274 P.3d 972 (citation omitted). We maintain the discretion to draw different inferences from the facts than those made by the district court. *In re Discipline of Grimes*, 2012 UT 87, ¶ 12, 297 P.3d 564, *as amended* (Mar. 21, 2013). Additionally, given our unique position regarding attorney discipline, we "make an independent determination as to" the correctness of the level of discipline actually imposed, *id.* (citation omitted), "although we always give serious consideration to the findings and [rulings] of the [district court]," *Babilis*, 951 P.2d at 213 (alterations in original) (citation omitted).

## ANALYSIS

¶18 We first address and clarify the standard for a presumption of disbarment in cases of misappropriation of client funds. We then apply that standard to determine whether disbarment is the presumptive sanction for Mr. Bates' operating account shortage and then his trust account shortages.

### I. DISBARMENT IN CASES OF MISAPPROPRIATION OF CLIENT FUNDS

¶19 Attorneys occupy a position of trust because their clients rely on their honesty, skill, and good judgment. When an attorney intentionally misappropriates a client's funds, it undermines the public's trust in the entire legal profession and discredits the legal system in general. *In re Discipline of Babilis*, 951 P.2d 207, 217 (Utah 1997) ("[T]he corrosive effect of such acts tends to undermine the foundations of the profession and the public confidence that is essential to the functioning of our legal system.").

¶20 In order to protect the "foundation[s] of . . . trust and honesty that are indispensable to the functioning of the attorney-client relationship," disbarment is usually appropriate in cases of intentional misappropriation of client funds. *Id.* Disbarment is the harshest sanction available for attorney misconduct. *In re Discipline of Lundgren*, 2015 UT 58, ¶ 11, 355 P.3d 984. It is "the proverbial professional death-sentence," *In re Discipline of Corey*, 2012 UT 21, ¶ 40, 274 P.3d 972, resulting in "the complete loss of [the attorney's] career and reputation," *In re Discipline of Johnson*, 2001 UT 110, ¶ 24, 48 P.3d 881 (Durham, J., concurring and dissenting). Despite the severe consequences, "intentional misappropriation of client funds will result in disbarment unless the lawyer can demonstrate truly compelling mitigating circumstances." *Corey*, 2012 UT 21, ¶ 22 (citation omitted).

¶21 However, not all misappropriation cases are intentional. To receive a presumption of disbarment, an attorney must "knowingly" misappropriate a client's funds "with the intent to benefit the lawyer or another or to deceive the court." UTAH SUP. CT. R. PROF'L PRACTICE 14-605(a)(1). On the other hand, if an attorney negligently misappropriates a client's funds, the presumptive sanction is a public reprimand. *Id.* 14-605(c).

¶22 "Knowledge" is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* 14-601(f). Thus, to prove the element of knowledge in rule 14-605(a)(1), the OPC must establish that the attorney was consciously aware of a fact that makes the attorney's conduct a violation of "Rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct," even though the attorney may not have intended to violate any of those rules or to harm that attorney's client. *See id.* 14-605(a)(1).

¶23 For a presumption of disbarment, the OPC must establish that the attorney knowingly engaged in misconduct at the time the misconduct occurred. Rule 14-605(a)(1) requires that the attorney "knowingly engages in professional misconduct." *Id.* 14-605(a)(1). This rule uses the present tense. This means that the attorney's knowledge of a fact that makes his action professional misconduct must exist at the time of the professional misconduct. *See Corey*, 2012 UT 21, ¶ 25 (distinguishing between attorneys who know at the time of misconduct that they are using client funds and those who "unwittingly" use those funds, even though they may have known at some point that the operating account held client money). Thus, for his behavior to be knowing, an attorney must be consciously aware that he is using client funds without authorization when he

makes the withdrawal or transfer. The policy behind the presumption of disbarment in cases of intentional misappropriation of client funds further supports this interpretation.

¶24 First, the presumption of disbarment serves to punish culpable attorneys for their wrongful conduct and to rehabilitate them when possible. *In re Discipline of Grimes*, 2012 UT 87, ¶ 18, 297 P.3d 564, *as amended* (Mar. 21, 2013) (Courts must weigh "the protection of the public and effective administration of justice with, when appropriate, the opportunity for attorney rehabilitation."). The rule's requirement that knowledge be contemporaneous with misconduct serves the purpose of delineating between the more culpable conduct of an attorney's dishonest act of knowingly taking his client's money, and the less culpable conduct of an attorney who negligently fails to realize that he is dipping into client funds. While the negligent use of client money is reprehensible, and certainly warrants sanctions, it does not typically qualify for the proverbial professional death sentence of disbarment.

¶25 Second, the presumption of disbarment protects the client and, in so doing, also protects public confidence in the legal system. *See Babilis*, 951 P.2d at 217. While the negligent use of client funds for an unauthorized purpose goes to the issue of competence, it does not give the general impression to the public that the legal profession is dishonest, greedy, and corrupt. Thus, the interest in protecting the public's confidence in the legal profession is not as strong in cases where an attorney negligently mistakes how much money an account is supposed to hold for each client and then uses some of a client's funds.

¶26 For these reasons, we hold that the OPC must establish knowledge at the time of the misappropriation. We recognize that direct evidence of knowledge at the time of misappropriation may not always be obtainable. However, an attorney's knowledge at the time of misappropriation may be inferred from the attorney's conduct and the surrounding circumstances. *See Corey*, 2012 UT 21, ¶¶ 25–26; *Gilbert v. Utah State Bar*, 2016 UT 32, ¶ 44, 379 P.3d 1247 ("[A] court is entitled to make findings based on circumstantial evidence.").

¶27 After establishing knowledge at the time of misappropriation, the OPC must prove intent where it seeks a presumptive sanction of disbarment under rule 14-605(a)(1). "Intent" is "the conscious objective or purpose to accomplish a particular result." UTAH SUP. CT. R. PROF'L PRACTICE 14-601(e). While an attorney need not have the conscious objective of misappropriating his client's funds, the OPC must establish that the

attorney had the conscious objective of benefiting himself, "or another or to deceive the court." *Id*. 14-605(a)(1). In proving intent, the OPC need only prove that the attorney used the money in some manner not authorized by the client. It does not need to prove precisely how that money was spent. *Corey*, 2012 UT 21, ¶ 23 ("[T]he precise fate of the funds (beyond the fact that they were not given to the client) [is not] material to the intent inquiry."). When a client's money is knowingly used by an attorney in a manner that was not authorized by the client, it can typically be inferred that it was used with the intent to benefit the attorney or another. *Id*. ¶¶ 26–27 (inferring that attorney intended to benefit himself or another when he "spen[t] that money in a manner chosen by him and not the client").

¶28 Thus, disbarment is the presumptive sanction when the attorney knows, at the time of misappropriation, that he is using client funds in a manner not authorized by the client. Using this standard, we first discuss whether disbarment is the presumptive sanction in this case for Mr. Bates' operating account shortage, and then for his trust account shortages.

## II. THE OPERATING ACCOUNT SHORTFALL WAS NEGLIGENT, BUT THE COMMINGLING OF FUNDS WAS KNOWING

¶29 The district court found that Mr. Bates, while initially ignorant that the $16,000 was incorrectly deposited, later discovered the $16,000 was in his operating account. Four weeks after the discovery, Mr. Bates transferred all of the $16,000 to Wasatch Advocates' payroll. Based on this, the district court inferred that Mr. Bates knowingly used client funds for his firm's payroll, but that, based on his trial testimony, he did not intend to benefit himself or another when he made the transfer. We disagree with the first part of the district court's inference. The OPC failed to prove that Mr. Bates knowingly used those funds to cover Wasatch Advocates' payroll. Mr. Bates did, however, knowingly commingle client funds.

*A. The OPC Failed to Prove That Mr. Bates Knowingly Used His Client's Funds*

¶30 In order to establish that Mr. Bates knowingly used client funds, the OPC carries the burden of proving that he knew he was using client funds at the time he made the transfer to payroll. While the OPC established that Mr. Bates knew that F.A. Apartments' funds were being held in the operating account four weeks prior to

the transfer, it failed to establish that he knew, at the time of the misappropriation, that those funds were being used for payroll.[3]

¶31 While an attorney's knowledge may be inferred from the surrounding circumstances, such an inference is not appropriate in this case. In *Corey*, the attorney made multiple withdrawals from his operating account, using over $50,000 of his client's funds for firm expenses over a period of four months. *In re Discipline of Corey*, 2012 UT 21, ¶ 4, 274 P.3d 972. He then "rac[ed] to cover his tracks" by suggesting that his client deposit the funds in a special needs trust, and, when that failed, encouraged his client to sign a promissory note turning the funds into a loan to the firm. *Id.* ¶¶ 5–6, 38. The attorney did all of this without disclosing that he had already spent the funds. *Id.* ¶ 38. Ten years after the fact, after repeated demands from the client, the attorney had still not repaid the funds. *Id.* ¶ 40. While the facts in *Corey*, even without direct evidence, created a strong inference that the attorney knowingly used his client's funds, such an inference is not supported by the facts of the present case.

¶32 On or about August 23, 2011, Mr. Bates learned that $16,000 belonging to F.A. Apartments had been mistakenly deposited into his operating account rather than the trust account. For unknown reasons, he did not, at that time or any time thereafter, transfer this money into his trust account. Four weeks after learning that the money was in his operating account, Mr. Bates transferred $20,000 from his operating account to his payroll account, leaving the account with a negative balance and using all of F.A. Apartments' $16,000 in the process.

¶33 However, Mr. Bates testified that he had no knowledge that the $16,000 was used for any other purpose than on behalf of F.A. Apartments, which the district court apparently accepted as true.[4] We note that an attorney's testimony will not always be sufficient to

---

[3] The OPC argues that when Mr. Bates knowingly transferred the money and used that money in a manner not authorized by his client, the intent to benefit himself or another must be inferred, making disbarment the presumptive sanction. We agree that, had the OPC proved knowledge, intent would typically be inferred in this type of situation. Mr. Bates clearly intended to use the money to benefit his employees and himself by paying their wages. However, the OPC failed to prove that Mr. Bates knowingly used his client's funds, mooting the OPC's argument about intent.

[4] This was the only direct evidence of Mr. Bates' mental state at the time of the transfer.

overcome an inference that the attorney acted knowingly. To hold otherwise would allow an attorney's dishonest conduct to go unsanctioned because of potentially untruthful testimony. While an attorney's testimony will not always negate an inference that the attorney acted knowingly, there is sufficient circumstantial evidence here to support the inference that Mr. Bates unwittingly used his client's money at the time of the transfer.

¶34 Mr. Bates' behavior before and after the payroll transfer support the inference that he did not know he was using client funds at the time of the transfer. The $16,000 was originally intended as a retainer for Mr. Bates' services. However, after he had already earned the bulk of that retainer, he agreed to use it to cover the deficiency in the $20,000 amount that F.A. Apartments needed to settle the foreclosure case. In the weeks before the transfer to payroll, Mr. Bates took two draws on his lines of credit, and he continued to have amounts from these sources that were more than sufficient to cover the payroll transfer. If he had remembered that F.A. Apartments' money was in his operating account, he could have used the available lines of credit instead of his operating account to finance the payroll. The ability and frequent use of his lines of credit for payroll support the inference that he unwittingly used his client's money.

¶35 Three days after the transfer, Mr. Bates took a $5,000 draw on his lines of credit, partially replenishing his operating account. Two days after that, he took a $7,000 draw. Within nine days, the account had a balance of over $76,000. Additionally, despite transferring the $16,000 to payroll, Mr. Bates made the $20,000 settlement payment in full, including the $16,000 that had been misappropriated, ten days after the payroll transfer. If he knew he was using his client's money when he made the payroll transfer, and he intended to keep it for himself or another, it is not likely he would have replenished the funds so quickly with borrowed money or made the settlement payment just ten days later. *See Corey*, 2012 UT 21, ¶ 40 (misappropriated funds still hadn't been repaid to client over a decade after they were misappropriated); *In re Discipline of Babilis*, 951 P.2d 207, 209–10 (Utah 1997) (attorney only repaid funds after the client had found out he had taken them); *In re Discipline of Grimes*, 2012 UT 87, ¶ 28, 297 P.3d 564, *as amended* (Mar. 21, 2013) (attorney didn't admit he needed to repay funds "until his sanction hearing, after the district court had already found that he had violated the Rules"); *In re Discipline of Johnson*, 2001 UT 110, ¶ 2, 48 P.3d 881 (after receiving two demand letters, attorney still hadn't returned money as of the time the Bar filed a complaint).

¶36 Another possible inference could be that Mr. Bates knowingly used his client's money to fund his payroll because he could not get a draw on a line of credit in time to make the payroll payment. However, if this were the case, it is unlikely he would have refilled his operating account with multiple draws over a ten-day period when he was able to replenish the entire amount almost immediately with one larger draw. If he were trying to "cover his tracks," as the attorney did in *Corey*, he likely would have taken one large draw to replenish the missing funds as soon as possible. This supports the inference that he did not knowingly decide to use his client's money with the intent to pay it back as soon as possible, but was instead caught unawares by the account deficiencies and moved promptly to address them.

¶37 The evidence at trial demonstrated that, despite hiring qualified accountants and a chief operating officer to help him, Mr. Bates was grappling with significant organizational difficulties associated with a quickly growing business and his own lack of experience. In short, as the district court stated, "Bates was in way over his head . . . on a scale which a more experienced lawyer would have avoided."

¶38 The evidence in this case corroborates Mr. Bates' testimony at trial, supporting the inference that he unwittingly used his client's funds for the firm's payroll. Because he was not aware he was using client funds when the transfer was made, his actions were not knowing. Rather, they were negligent, with a presumptive sanction of a public reprimand. *See* UTAH SUP. CT. R. PROF'L PRACTICE 14-605(c) (public reprimand is "generally appropriate" when the attorney "negligently engages in professional misconduct . . . and causes injury to a party"). [5]

---

[5] There are three times that a presumption of disbarment is appropriate under Utah Supreme Court Rule of Professional Practice 14-605(a). Our analysis here addresses only the first, under subsection (a)(1). Because we hold that the transfer to payroll was not a knowing use of client funds, the other two subsections are not applicable. Rule 14-605(a)(2) requires a presumption of disbarment when a lawyer "engages in serious criminal conduct" that includes an element of "fraud, extortion, misappropriation, or theft." The OPC, while mentioning this rule, does not provide any analysis as to why Mr. Bates' actions constitute serious criminal conduct. In the case of *In re Discipline of Ince*, we held that an attorney violated this subsection by committing theft of his client's funds. 957 P.2d 1233, 1237 (Utah 1998) (quoting UTAH CODE § 76-6-405 ("A person

*B. Mr. Bates Knowingly Commingled Client Funds*

¶39 While Mr. Bates negligently transferred client funds to payroll, he knowingly commingled those funds, creating the risk that they would be used for the firm's operating expenses. Mr. Bates learned that client funds were in his operating account four weeks prior to the payroll transfer, but failed to take any action to safeguard that money. Utah Rule of Professional Conduct 1.15(a) requires lawyers to "hold property of clients . . . separate from the lawyer's own property." When the client's property consists of money that is deposited in some kind of account, the client's "[f]unds shall be kept in a separate account" from the attorney's funds. UTAH R. PROF'L CONDUCT 1.15(a). When an attorney knowingly violates this rule, but without the intent to benefit himself or another, and "causes injury or potential injury" to his client, the presumptive sanction is suspension. *See* UTAH SUP. CT. R. PROF'L PRACTICE 14-605(b); *Utah State Bar v. Jardine*, 2012 UT 67, ¶¶ 47–53, 83, 289 P.3d 516 (attorney suspended for knowingly commingling funds, among other violations); *In re Hughes Disciplinary Proceeding*, 534 P.2d 892, 892 (Utah 1975) (attorney suspended when he commingled his "clients' funds with [his] personal funds," and acted with some level of culpability).

¶40 At oral argument before this court, Mr. Bates' counsel conceded that Mr. Bates knowingly left the $16,000 in the operating account, which resulted in a commingling of funds and a serious failure to safeguard those funds. Oral Argument at 31:29 – 32:44 (No. 20150483), https://www.utcourts.gov/opinions/streams/sup ("[Mr. Bates] knowingly violated 1.15(a) . . . those funds were commingled, he discovered, on August 23rd, and he didn't do anything about it that day. . . . That is a knowing violation of the Rules of Professional Conduct."). The failure to safeguard his client's funds caused potential injury to his client because there is a risk that comingled funds will be used for firm operating expenses. While

---

commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof.")). In this case, Mr. Bates was not acting with the "purpose to deprive" F.A. Apartments of their funds because he did not know he was using client funds. Indeed, it is difficult to imagine negligent misconduct ever rising to the level of serious criminal conduct. For similar reasons, subsection (a)(3) does not apply. Subsection (a)(3) requires a showing that Mr. Bates engaged in "intentional misconduct." Because he did not knowingly use his client's funds, he likewise did not intentionally misappropriate his client's funds.

Mr. Bates knowingly violated rule 1.15(a), there is no evidence that on August 23, 2011, when Mr. Bates left the funds in the operating account, he intended to benefit himself or another.[6]

¶41　We hold that the OPC failed to meet its burden of proof that Mr. Bates knowingly misappropriated his client's funds. We do, however, hold that he knowingly commingled client funds and that he created the risk of injury to his client by later using F.A. Apartments' money. Suspension is the presumptive sanction for Mr. Bates' actions in commingling client funds without the intent to benefit himself or another. *See* UTAH SUP. CT. R. PROF'L PRACTICE 14-605(b).[7]

## III. THE TRUST ACCOUNT SHORTFALLS WERE NEGLIGENT

¶42　The OPC has also failed to meet its burden of proof that Mr. Bates knowingly caused the shortfalls in F.A. Apartments' money that should have been in the trust account on January 3, March 17, and June 30, 2011. The OPC's primary argument is based on trial testimony that Mr. Bates "could" have reviewed Quick Books and other accounting materials before making the transfers. The OPC argues that because he "could" have reviewed these records and seen how much of F.A. Apartments' money was supposed to be in the trust account before making the transfers, we should hold that he knowingly transferred F.A. Apartments' funds with the intent to use them for an unauthorized purpose. We decline to do so and affirm the district court's holding that Mr. Bates was negligent.

¶43　As stated above, the OPC must establish that Mr. Bates knew the client's funds were being used in a manner not authorized by the client at the time of the transfer or withdrawal. *Supra* ¶ 26. The OPC's argument that we should infer that Mr. Bates knowingly used F.A. Apartments' funds simply because he "could" have checked his accounting records does not undermine his testimony

---

[6] Mr. Bates directed his receptionist to deposit the money into his trust account, but the receptionist failed to follow his instructions. Thus, Mr. Bates did not knowingly commingle funds when the $16,000 was deposited into the operating account. However, when he later learned that F.A. Apartments' money was in the operating account, Mr. Bates knowingly violated the rule by failing to timely transfer it into his trust account.

[7] The presumption of disbarment in Supreme Court Rules of Professional Practice 14-605(a)(2) and (a)(3) do not apply to this conduct for the same reasons noted *supra* paragraph 38, note 5.

and the large amount of evidence creating the inference that Mr. Bates was negligent. There is no direct evidence that Mr. Bates knew, at the time of the withdrawals, how much money belonging to F.A. Apartments was supposed to be in the trust account. The only direct evidence of Mr. Bates' mental state at the time of the shortfalls was his testimony that he did not know he was dipping into F.A. Apartments' funds. The district court apparently found this testimony credible and we have no reason to alter that finding on appeal.

¶44 The circumstantial evidence supports Mr. Bates' testimony. Mr. Bates regularly made authorized expenditures from F.A. Apartments' money in the trust account, and kept records of the same. However, Mr. Bates would not have had the ability to say, on any given day, how much money was being held in the firm's trust account for any particular client without considerable effort. At the end of his representation of F.A. Apartments, he returned all the money it was due. F.A. Apartments was completely satisfied with Mr. Bates' representation. When the shortfalls occurred, there were sufficient funds in the operating account to cover those shortfalls. His lines of credit were also more than sufficient to cover the three shortfalls. In general, his accounting was unorganized, despite all of his corrective efforts.

¶45 All of this evidence supports his testimony and implies that he unwittingly transferred a portion of F.A. Apartments' money into his operating account. We affirm the district court regarding the trust account shortfalls, and hold that Mr. Bates' actions were negligent with a presumptive sanction of a public reprimand. *See* UTAH SUP. CT. R. PROF'L PRACTICE 14-605(c).

## IV. AGGRAVATING AND MITIGATING FACTORS

¶46 After determining the presumptive sanction as our starting point, we must determine whether a more or less severe sanction is warranted. *In re Discipline of Grimes*, 2012 UT 87, ¶ 18, 297 P.3d 564, *as amended* (Mar. 21, 2013) (court must "craft[] appropriate, individualized sanctions"). In determining the appropriate sanction, "we look to 'the duty violated, the lawyer' s mental state, the potential or actual injury caused, and the existence of aggravating or mitigating circumstances.'" *Id.* ¶ 23 (citation omitted). "The presumptive discipline may be increased from suspension . . . to disbarment in the case of overwhelming aggravating factors, or decreased from suspension to a reprimand in the case of unusual or substantial mitigating factors." *In re Discipline of Babilis*, 951 P.2d 207, 215 (Utah 1997); *see also In re Discipline of Ince*, 957 P.2d 1233, 1237–38 (Utah 1998) ("To justify a departure from the presumptive level of

discipline set forth in the Standards, the aggravating and mitigating factors must be significant."); *In re Discipline of Crawley*, 2007 UT 44, ¶ 20, 164 P.3d 1232 (After determining the presumptive sanction, the court "then weighs the aggravating and mitigating circumstances . . . and departs from the presumptive level of discipline if the aggravating and mitigating factors are 'significant.'" (citation omitted)). While an increase or decrease in the type of sanction requires unusual or substantial factors, district courts have broad discretion to craft sanctions inside of the presumptive level of sanction. *Crawley*, 2007 UT 44, ¶ 24 (upholding district court's exercise of "its discretion" in ordering probation inside of presumptive level of suspension); *Babilis*, 951 P.2d at 213 (although we "make an independent judgment regarding the appropriate level of discipline," we "always give serious consideration to the findings and [rulings] of the [district court]." (alterations in original) (citation omitted)). *But see Grimes*, 2012 UT 87, ¶¶ 19–21 (because of the special implications of disbarment, there is no room within the disbarment sanction to adjust the sanction absent "truly compelling mitigating circumstances").

¶47 We first note that the duty to protect client property is significant. It is no accident that attorneys hold their client's funds in "trust" accounts. Clients trust their attorney to safeguard the property they leave in their attorney's possession. That being said, Mr. Bates negligently used F.A. Apartments' money, but quickly returned it to the complete satisfaction of the client.

¶48 The district court found only one aggravating factor: multiple offenses that constituted a pattern of misconduct.[8] The district court held that there were seven mitigating factors: 1) absence of a prior disciplinary record, 2) absence of a dishonest or selfish motive, 3) timely good faith effort to make restitution,[9] 4) full

---

[8] The majority of these offenses have to do with Mr. Bates' negligent operation of his operating and trust accounts.

[9] The OPC argues this should not be a mitigating factor. In one of the multiple matters (not at issue in this opinion) dealing with Mr. Bates' negligent management of the firm's bank accounts, Mr. Bates did not repay the amount to the client until the screening panel hearing. Mr. Bates likely failed to pay because he did not become aware that the firm was holding any of the client's money until he was served with the bar complaint. Another attorney in his firm, who was handling the matter, quit the firm without telling him about the funds. Once Mr. Bates learned the amount owed at the hearing, he promptly paid. Additionally, the OPC does not allege

and free disclosure to the OPC, 5) inexperience in the practice of law,[10] 6) good character or reputation, and 7) remorse. We agree with the district court's findings on the aggravating and mitigating factors in this case and we affirm its slight reduction to a five-month suspension.[11]

## CONCLUSION

¶49 We hold that, for a presumption of disbarment, the OPC must prove knowledge at the time of the transfer or withdrawal in cases where an attorney's bank account dips below the amount that is supposed to be held for the attorney's clients. Accordingly, we hold that the OPC failed to meet its burden of proof regarding the operating and trust account shortfalls. We also hold, however, that Mr. Bates knowingly failed to safeguard client funds. Suspension is the presumptive sanction, and we affirm the district court's order for a five-month suspension in light of the mitigating factors.

———————

that he failed to make prompt repayment of all the other client funds he negligently used.

[10] The OPC argues this should not be a mitigating factor. In *Grimes* we stated that "it does not take substantial experience in the practice of law to know that misappropriation is improper," because "the prohibition on misappropriation of client funds is fundamental to the practice of law." 2012 UT 87, ¶ 26. This analysis does not apply in this case, as Mr. Bates did not knowingly misappropriate his client's funds. Rather, his inexperience is directly related to his negligent management of the firm's operating and trust accounts.

[11] The district court's judgment ordered Mr. Bates' suspension to begin on July 1, 2015, and to run for five months. Mr. Bates is not the appellant in this case, nor does it appear that he filed a motion to suspend judgment pending the outcome of this appeal. *See* UTAH R. CIV. P. 62(d) (appellant "may obtain a stay" pending the outcome of an appeal by paying a supersedeas bond). The parties did not brief whether he has already fulfilled his five-month suspension. If Mr. Bates has fulfilled the judgment for a five-month suspension, no further sanction is necessary or appropriate.