*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 46**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Discipline of:
DAVID O. LEAVITT

DAVID O. LEAVITT,
*Petitioner,*

*v.*

OFFICE OF PROFESSIONAL CONDUCT,
*Respondent.*

No. 20231103
Heard February 28, 2025
Filed October 30, 2025

On Petition for Review of Supreme Court Ethics and Discipline
Committee's Order of Discipline

Attorneys:

Freyja Johnson, Emily Adams, Mikayla Irvin, Bountiful,
for petitioner

Christine T. Greenwood, Michelle R. Daniels, Salt Lake City,
for respondent

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    David Leavitt was serving as the Utah County Attorney when that office prosecuted Jerrod Baum for the brutal murder of two teenagers. As this high-profile case was proceeding in the district court, Leavitt held a press conference to announce that the Utah County Attorney's Office intended to seek the death penalty. At the press conference, Leavitt explained to the public his reasons

for making this weighty decision. While he was doing so, however, he also commented on Baum's character, vouched for the credibility of the State's witness "based on a lot of evidence that the jury will never hear," suggested that Baum was guilty, and made other potentially inflammatory statements. After pretrial litigation involving this incident, the district court presiding over Baum's case concluded that some of Leavitt's statements violated rule 3.6 of the Utah Rules of Professional Conduct, which exists to prevent attorneys who are investigating or litigating a case from making extrajudicial statements that have a substantial likelihood of materially prejudicing the legal proceeding. Leavitt seeks review of a subsequent Order of Discipline from the Supreme Court Ethics and Discipline Committee, which also determined that he violated rule 3.6 and ordered that he be sanctioned with a public reprimand.

¶2   Rule 3.6 recognizes the risk that a lawyer's public commentary, especially in a criminal case, may unfairly taint the jury pool or otherwise compromise the legal proceeding. As officers of the court, all attorneys have a responsibility to protect the integrity of the judicial process. This is especially true when the attorney is in a position of public trust, like an elected county attorney responsible for prosecuting criminal conduct.

¶3   We agree that Leavitt made statements at the press conference that violated rule 3.6. And we conclude that the appropriate sanction is a public reprimand.

## BACKGROUND

¶4   The Utah County Attorney's Office (the Office) charged Jerrod Baum with multiple crimes for murdering two teenagers and throwing their bodies into a mineshaft. *See State v. Jerrod William Baum*, Fourth District Court, Case No. 181401062. The case received extensive pretrial publicity in Utah, including at least 143 written news articles and 247 television news spots with a total audience rating of 8.6 million.

¶5   At the time, David Leavitt was serving as the elected Utah County Attorney. He was an experienced attorney, having been licensed to practice law in Utah for nearly thirty years. He had practiced criminal law both as a defense attorney and as a prosecutor—having served as a county attorney in a different county. He had a distinguished reputation in the legal community and had no history of professional discipline.

¶6    During the litigation of Baum's case, Leavitt made the decision to seek the death penalty. To Leavitt's knowledge, the Office had not sought the death penalty for a criminal defendant in nearly forty years. To explain his reasons for doing so, and to make good on his campaign promise to promote greater transparency into the workings of the Office, he decided to hold a press conference to announce the decision. Public media outlets were invited and attended. The conference was streamed live on the Office's public Facebook page. And afterward, the Office posted the video of the press conference on its Facebook page.

¶7    To prepare, Leavitt created a script with bullet points outlining what he planned to say. He also spoke with his deputy, Larry Weiss, who expressed concerns about the risks of press conferences. Nevertheless, Leavitt proceeded.

¶8    As Leavitt made his remarks at the press conference, he followed his bulleted script and covered a variety of topics related to the case, including his reasons for seeking the death penalty. He also made the following comments, which are relevant here:

> In December of 2017, Breezy Otteson and Riley Powell came to very, very tragic ends. As for no reason whatsoever, they were brutely tortured and murdered and thrown, like mere trash, down a garbage – mere trash down a mineshaft where their bodies lay until they were found some 250 feet below the surface. The alleged killer of Riley and Breezy is the sort of individual [from] whom society ought to be protected. The alleged killer of Riley and Breezy is the sort of individual, among others, for whom we should be devoting our resources, who should be getting our attention.
>
> . . . .
>
> I'm aware that it will cost Utah County at least a million dollars more in defense fund[s] if I authorize the death penalty. I'm aware that the last person in Utah County to receive the death penalty was Ron Lafferty in 1984, and he's still alive. I'm aware that if I authorize the death penalty to be sought, and if a jury convicts this alleged killer that – and if he is given the death penalty, that he may never be executed . . . . It literally is more costly to society to

execute someone than it is to house them in prison forever.

. . . .

It also, as I thought about this, underscores the inherent inequity in our system of how this all gets paid for. And I'm not making the decision today based on money. But I am occupying this podium today to talk about the money issue of this because someone needs to raise the issue.

. . . .

The alleged killer is from Juab County. One victim, Riley, is from Juab County. Another victim, Breezy, is from Tooele County. This murder was committed 1.3 miles as the crow flies, outside of Juab County into Utah County. And the question therefore of whether to seek the death penalty or not falls to me, despite the fact that there is no connection whatsoever to Utah County other than that's where this crime was committed. Had this crime been committed in Juab County, Juab County would be writing a check for a million dollars, if it sought the death penalty.

. . . .

Nothing I will do today, nothing that our – my office will do in the next year, year and a half will do anything to bring Breezy and Riley back. If pulling a trigger or injecting a needle would bring Breezy or Riley back, I would do so personally.

¶9 After finishing his prepared remarks, Leavitt took questions from the media. The first questioner inquired whether Leavitt was concerned about the lack of physical evidence in the case and the fact that the State had only one witness. Leavitt responded by saying:

The question of how much evidence do I have should not factor into whether I seek death or not. The question – the evidence that I have, the decision that that should – should impact this is whether I prosecute him at all or not. And we have concluded in our estimation, this witness is credible. This – this witness' testimony has been corroborated. And we believe this witness. And we believe this witness,

quite frankly, based on a lot of evidence that the jury will never hear. And so we know things that the jury will never hear which helps us to believe and strengthens our belief that this man committed this murder, these murders.

¶10   Immediately after the press conference, Leavitt returned to his office to find Weiss "quite animated because of the extrajudicial statement which [Leavitt] made." Weiss was "extremely adamant" that Leavitt should not have made the statements, and he predicted a motion to disqualify the Office from the case. Leavitt and Weiss specifically discussed whether any of his comments would have a substantial likelihood of materially prejudicing a jury. Weiss argued that Leavitt should wall himself off from the case, which Leavitt did, despite the fact that he did not believe his statements warranted it. From that point on, Leavitt did not participate further in Baum's case.[1]

¶11   Leavitt and the Office made efforts to mitigate any damage caused by Leavitt's comments and to ensure that he did not repeat his mistake. Weiss immediately instructed the Office's public information officer to take the video of the press conference off the Facebook page. And for future press conferences, Leavitt "changed [his] practice entirely." He worked with his leadership team to prepare exactly what he was going to say in advance. Then he would "video [his] statement and . . . send it out to the news media [] with no opportunity for questions."

¶12 A week after the press conference, the district court presiding over Baum's case issued a protective order on its own motion, ordering that the "[l]awyers who have participated, who are now participating, or who will yet participate in the investigation or litigation of this case in any way shall abide strictly by [r]ule 3.6 of the Utah Rules of Professional Conduct." The court explained that the case "has generated and is likely to continue to generate significant pre-trial and trial publicity," which threatened to "compromise both the Defendant['s] and the State of Utah's right to due process of law and right to a fair and impartial jury trial." The court noted, "Pre-trial publicity is of particular concern because it can taint the prospective jury pool."

---

[1] We note, however, that Leavitt later made the decision to take the death penalty off the table.

¶13 However, about six months later, Baum's defense counsel informed the court that the video of the press conference was still available on the Office's Facebook page. Upon learning this, Leavitt immediately ensured the video was removed. But defense counsel's discovery led to litigation in the district court, which involved full briefing by the parties, another order from the court, and an evidentiary hearing in which Leavitt was called as a witness. Ultimately, the district court concluded that Leavitt had been unaware that the video was still posted, and it denied defense counsel's request for contempt sanctions.

¶14 As Baum's trial approached, defense counsel moved the court to sanction Leavitt, change venue, and expand the jury venire based in part on Leavitt's statements at the press conference. The district court denied the request for a change of venue, but it did expand the jury venire. The court also sanctioned Leavitt individually. It concluded that his statements violated rule 3.6, and consequently it disqualified Leavitt from participation in the case.

¶15 Subsequently, one of Baum's attorneys filed a complaint with the Office of Professional Conduct (OPC), alleging that Leavitt had violated rule 3.6. The OPC investigated the complaint and brought it before a Screening Panel of the Ethics and Discipline Committee (Committee).[2] The Panel determined that Leavitt had violated rule 3.6 and recommended that he be publicly reprimanded as a sanction.

¶16 Leavitt filed an exception with the Committee Chair as provided for in rule 11-532 of the Supreme Court Rules of Professional Practice.[3] Leavitt argued, first, that "there was no evidence proving that he knew or should have known his remarks had a substantial likelihood of materially prejudicing the proceedings under [r]ule 3.6," and, second, that "the appropriate sanction was at most an admonition rather than a public reprimand." The Chair delegated the matter to one of the Vice

---

[2] In the proceedings before the panel, "[t]he OPC carries the burden of proof." SUP. CT. R. PRO. PRAC. 11-542(c).

[3] When a party to a disciplinary proceeding files an exception to a panel decision with the Chair of the Committee, "[t]he party who files an exception has the burden of showing that the determination or recommendation of the screening panel is unsupported by substantial evidence." *Id.* R. 11-532(e)(4).

Chairs of the Committee. *See* SUP. CT. R. PRO. PRAC. 11-510(c). And the Vice Chair denied Leavitt's exception and adopted the findings and recommendation of the Screening Panel, although the Vice Chair's analysis regarding the applicable sanction differed. The Committee then entered an Order of Discipline directing that Leavitt be publicly reprimanded for violating rule 3.6.

¶17 Leavitt appeals the Order to us. We have jurisdiction to hear this appeal under section 78A-3-102(3)(c) of the Utah Code.

## STANDARDS OF REVIEW

¶18 The Utah Constitution gives this court the authority to govern attorney discipline by rule. UTAH CONST. art. VIII, § 4 ("The Supreme Court by rule shall govern the practice of law, including . . . the conduct and discipline of persons admitted to practice law."); *see also In re Discipline of Kinikini*, 2023 UT 17, ¶ 15, 533 P.3d 1156 ("The Utah Constitution gives this court explicit and exclusive power to govern the practice of law." (cleaned up)). Accordingly, we have promulgated the Supreme Court Rules of Professional Practice.

¶19 Under those rules, a party appealing a final Committee disposition to this court "has the burden of demonstrating that the Committee action was":

1) based on a determination of fact not supported by substantial evidence when viewed in light of the whole record before the Court;

2) an abuse of discretion;

3) arbitrary or capricious; or

4) contrary to Chapter 11, Article 5 of the Supreme Court Rules of Professional Practice.

SUP. CT. R. PRO. PRAC. 11-535(e). Leavitt raises two issues, which implicate the first and fourth standards, respectively.

¶20 First, he challenges the Committee's conclusion that he violated rule 3.6, asserting that its finding that he knew or should have known that his statements had a substantial likelihood of materially prejudicing an adjudicative proceeding is not supported by substantial evidence. *See id.* R. 11-535(e)(1). We have explained that "under our traditional substantial evidence standard of review, a decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *In re*

*Discipline of Reneer*, 2014 UT 18, ¶ 10, 325 P.3d 104 (cleaned up). "[W]e do not reweigh the evidence and independently choose which inferences we find to be the most reasonable, but merely determine if sufficient evidence exists to allow a reasonable factfinder to arrive at a particular conclusion." *Id.* (cleaned up). However, our substantial evidence standard of review differs somewhat in attorney discipline cases. *See id.* ¶¶ 10–11. Given our constitutional mandate to govern the practice of law, *see supra* ¶ 18, and the "unique nature of disciplinary actions . . . [w]e reserve the right to draw inferences from basic facts which may differ from the inferences drawn by the [Committee]," *Reneer*, 2014 UT 18, ¶ 11 (cleaned up).

¶21 Second, Leavitt challenges the sanction imposed by the Committee. He argues that it misapplied the sanction rules governing his conduct.[4] We review whether the Committee has acted contrary to the Rules of Professional Practice[5] for correctness. *Nemelka v. Ethics & Discipline Comm. of Utah Sup. Ct.*, 2009 UT 33, ¶ 9, 212 P.3d 525 ("We . . . afford no deference to [the Committee's]

---

[4] We note that the parties are asking us to apply the sanction rules in effect at the time of the press conference in 2019 (although they have at times used the substantially similar 2020 rules), rather than the rules in effect at the time the Committee determined Leavitt's sanction in 2023. *Compare* SUP. CT. R. PRO. PRAC. 14-605(c)–(d) (2019) (describing when a public reprimand or private admonition is generally appropriate for a violation of any of the Rules of Professional Conduct), *with id.* R. 11-585(b)(2)–(3) (2023) (describing when a public reprimand or private admonition is generally appropriate in the context of a violation of rule 3.6 specifically). We are not sure this is correct, *see infra* ¶ 48 n.10, but we do the same since neither side has contested this or briefed how the 2023 rules would apply here.

[5] Since 2019, the sanction rules have been relocated from Chapter 14, Article 5 to Chapter 11, Article 5 of the Supreme Court Rules of Professional Practice. But the 2019 version of the rules articulated the same burden on appeal that applies here. *See* SUP. CT. R. PRO. PRAC. 14-510(f)(5) (2019) ("The party requesting review [by the supreme court] shall have the burden of demonstrating that the Committee action was . . . [c]ontrary to Articles 5 and 6 of Chapter 14 of the Rules of Professional Practice of the Supreme Court."). Accordingly, we cite the current version of the rules.

interpretation of our rules."). Additionally, "when we review the sanction imposed [for a violation of the rules of professional conduct], our constitutional responsibility requires us to make an independent determination as to its correctness." *In re Discipline of Brussow*, 2012 UT 53, ¶ 13, 286 P.3d 1246 (cleaned up). "We need not . . . defer to the Committee in deciding what may constitute appropriate discipline." *Johnson v. Off. of Pro. Conduct*, 2014 UT 57, ¶ 14, 342 P.3d 280 (cleaned up).

## ANALYSIS

¶22 We first consider Leavitt's argument that the Committee's determination that he violated rule 3.6 is not supported by substantial evidence. We then move to his argument regarding the appropriate sanction in this matter.

¶23 While some of our analysis differs, we ultimately agree with the Committee that Leavitt violated rule 3.6 and that a public reprimand is the appropriate sanction.

I. THE COMMITTEE'S DETERMINATION THAT LEAVITT VIOLATED RULE 3.6 IS SUPPORTED BY SUBSTANTIAL EVIDENCE

¶24 Rule 3.6 of the Utah Rules of Professional Conduct aims to protect legal proceedings from the prejudice that can result when lawyers make public commentary about matters in which they are involved. The rule provides that "[a] lawyer who is participating . . . in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." UTAH R. PRO. CONDUCT 3.6(a).

¶25 Leavitt does not dispute the Committee's findings about the basic underlying facts. He does not challenge that he made the statements attributed to him at the press conference to announce that his Office was seeking the death penalty in the Jerrod Baum case. Nor does he dispute that public media outlets were invited to and attended the press conference, that it was streamed live on the Office's public Facebook page, and that it was a high-profile case.

¶26 With respect to the elements of a rule 3.6 violation, Leavitt does not contest that he was a lawyer participating in the litigation of the Baum case when he held the press conference, nor that the statements at issue were extrajudicial. Further, he concedes that he

knew his statements would be "disseminated by means of public communication."

¶27 Leavitt's argument is that there is not substantial evidence in the record showing that he knew or reasonably should have known that his remarks at the press conference would have a substantial likelihood of materially prejudicing the Baum proceedings. He reasons that any potentially prejudicial comments he made were counterbalanced by the need to explain why he had decided to seek the death penalty, an important matter of public interest.

¶28 In the Committee's numbered findings of fact, it found that Leavitt made the following comments during the press conference:[6]

1) [T]he victims in the case were treated like "mere trash" by the alleged killer, Mr. Baum.

2) [T]he alleged killer "is the sort of individual from whom society ought to be protected."

3) [I]f he authorized the death penalty to be sought in this case, [Leavitt] was "aware that it w[ould] cost Utah County at least a million dollars more in defense funds," and that if the alleged killer "is given the death penalty ... he may never be executed."

4) [T]he two victims were from Juab County and Tooele County, respectively, and the alleged killer was from Juab County. "[T]here is no connection whatsoever to Utah County other than that's where this crime was committed."

5) "Had this crime been committed in Juab County, Juab County would be writing a check for a million dollars, if it sought the death penalty."

6) "If pulling a trigger or injecting a needle would bring [the victims] back, [he] would do so personally."

---

[6] These statements are numbered seven through fifteen in the Committee's findings of fact. However, for ease of reference, we have renumbered them one through nine.

    7) [H]e would give the power back to the people to decide whether the alleged killer is guilty or innocent and whether he should receive the death penalty. Leavitt then announced his decision to allow the death penalty to be considered in this case.

    8) When a member of the press asked . . . whether he was concerned about the lack of physical evidence when there was just one witness, [he] stated that "this witness is credible," and the "witness' testimony has been corroborated." And,

    9) "[W]e believe this witness, quite frankly, based on a lot of evidence that the jury will never hear. And so, we know things that the jury will never hear which helps us to believe and strengthens our belief that this man committed [this] murder, these murders."

¶29 The Committee concluded that these comments "contain[ed] no less than eight statements that support . . . a violation of [r]ule 3.6."[7] Leavitt contests this determination.

¶30 He argues that some of the statements, specifically one through seven, would not have prejudiced the proceeding. And with respect to statements eight and nine, he argues that there is not substantial evidence that he had the requisite mental state—in other words, that he *knew or reasonably should have known* these statements had a substantial likelihood of materially prejudicing the Baum proceedings.

¶31 We conclude that there is substantial evidence in the record that Leavitt knew or reasonably should have known that, at a minimum, the statements numbered two, eight, and nine had a substantial likelihood of materially prejudicing the proceedings. These three statements are of the type specifically identified in comment 5 to rule 3.6 as "more likely than not to have a material

---

[7] It does not appear that the Committee deemed each of the numbered statements to violate rule 3.6. And it did not identify with particularity the eight statements (within the nine identified) that it deemed to violate the rule. However, Leavitt addresses each one of them. We address only the statements necessary to our analysis.

prejudicial effect on a proceeding." The subjects identified in comment 5 as belonging in this category include: "the character, credibility, [or] reputation . . . of a party . . . or witness"; and "any opinion as to the guilt or innocence of a defendant." UTAH R. PRO. CONDUCT 3.6 cmt. 5(i), (iv).

¶32 While subjects included in the comment are "more likely than not" to violate the rule, more analysis is needed to determine whether, in a particular instance, a lawyer has actually violated the rule—even where the lawyer has made a statement that arguably falls within comment 5. Courts and disciplinary bodies must consider the specific statements made and the surrounding circumstances to make this determination. For example, courts applying a comparable rule have considered, among other things, when the statement was made in relation to trial, the attention the case and comments received, and the role and reputation of the speaker. *See, e.g.*, *Att'y Grievance Comm'n of Md. v. Gansler*, 835 A.2d 548, 571–73 (Md. App. Ct. 2003) (observing that "the timing of an extrajudicial statement may affect its prejudicial effect," that the remarks were made during a "very public and controversial prosecution," and that a lead prosecutor's opinion of guilt is more likely to cause prejudice than comments from other lawyers); *In re Brizzi*, 962 N.E.2d 1240, 1246 (Ind. 2012) (stating that a "prosecutor's opinion of guilt is particularly likely to create prejudice").

¶33 So here, we consider the specific statements Leavitt made and the context in which he made them to determine whether he violated rule 3.6.

¶34 Looking first to statement number two, Leavitt said that "the alleged killer 'is the sort of individual [from] whom society ought to be protected.'" *Supra* ¶ 28 (Statement 2). This was an inappropriate comment on Baum's character. *See* UTAH R. PRO. CONDUCT 3.6 cmt. 5(i) (explaining that comments about "the character" of a criminal defendant are "more likely than not to have a material prejudicial effect on a proceeding"). Leavitt argues that this statement would not have caused prejudice because he did not use Baum's name. But in the context of the press conference, it was obvious who Leavitt was talking about. Leavitt was announcing that his Office was seeking the death penalty in its prosecution of Baum. Referring to Baum as "the alleged killer" did not change the fact that Leavitt had essentially told the public that Baum was a dangerous person—"the sort of individual" from whom they needed to be protected.

¶35 Later, in statements eight and nine, Leavitt answered a reporter's question about the lack of physical evidence and the fact that the Office had only one witness. Leavitt responded:

> And we have concluded in our estimation, this witness is credible. This – this witness' testimony has been corroborated. And we believe this witness. And we believe this witness, quite frankly, based on a lot of evidence that the jury will never hear. And so we know things that the jury will never hear which helps us to believe and strengthens our belief that this man committed this murder, these murders.

*Supra* ¶ 28 (Statements 8 and 9).

¶36 These are the most problematic statements that Leavitt made at the press conference. He vouched for the credibility of the State's witness, proclaiming that "this witness is credible," and "we believe this witness." He opined that Baum was guilty, saying, "And so, we know things that the jury will never hear which *helps us to believe and strengthens our belief that this man committed this murder, these murders*." (Emphasis added.) And the potential for prejudice was heightened when Leavitt stated that his confidence in the witness and his belief in Baum's guilt was based "on a lot of evidence that the jury will never hear."

¶37 Viewing these three statements in context, it is clear that they had a substantial likelihood of materially prejudicing the proceedings. Importantly, the remarks were made in relation to a capital criminal case, and as another comment to rule 3.6 explains, "criminal jury trials will be most sensitive to extrajudicial speech." UTAH R. PRO. CONDUCT 3.6 cmt. 6 (cleaned up).

¶38 Additionally, Leavitt made the remarks at a live-streamed press conference in which he announced that his Office was seeking the death penalty against Baum. This was a high-profile case that had already received much media attention. And the press was in attendance that day. So Leavitt knew that his statements would be broadcasted and reported on, including in Utah County where the prospective jury pool lived.

¶39 Finally, Leavitt's position as the County Attorney made the potential for prejudice even higher. His statements likely carried more weight in the eyes of the public. *See Gansler,* 835 A.2d at 559 ("Comments by prosecuting attorneys, in particular, have the inherent authority of the government and are more likely to

influence the public."); *In re Brizzi*, 962 N.E.2d at 1246 ("A prosecutor's opinion of guilt is particularly likely to create prejudice, given that his or her words carry the authority of the government and are especially persuasive in the public's eye.").

¶40 Leavitt contends that the potential for prejudice was lessened because Baum's trial did not take place until much later. We agree that the statements' proximity to trial is relevant. However, it is not dispositive. *See, e.g.*, *Gansler*, 835 A.2d at 571–73 (disciplining a prosecutor for extrajudicial statements made well before trial occurred). And we conclude that the time between these statements and the trial date did not neutralize the substantial likelihood that they would materially prejudice the trial. This is borne out by the fact that the district court found it necessary to take additional measures during jury selection to ensure that a fair and impartial jury could be seated. *See supra* ¶ 14.

¶41 However, Leavitt argues that there is not substantial evidence that he possessed the requisite mental state when he made the comments—in other words, that he knew or reasonably should have known of this potential for prejudice. The Rules of Professional Conduct define "[k]nowingly," "known," and "knows" as "actual knowledge of the fact in question." UTAH R. PRO. CONDUCT 1.0(g). "A person's knowledge may be inferred from circumstances." *Id.*; *see also In re Discipline of Santana*, 2021 UT 39, ¶ 39, 496 P.3d 50 ("Circumstantial evidence may be used to find mental state on the basis of reasonable inferences drawn from the evidence." (cleaned up)). And the standard for "[r]easonably should know," "when used in reference to a lawyer," means that "a lawyer of reasonable prudence and competence would ascertain the matter in question." UTAH R. PRO. CONDUCT 1.0(o).

¶42 We conclude that, at a minimum, Leavitt reasonably should have known that these three statements would violate rule 3.6. As discussed, comment 5 specifically identifies these types of statements as more likely than not to materially prejudice an adjudicative proceeding. In this way, the comment functions to put "a lawyer of reasonable prudence and competence," *id.*, on notice that extrajudicial, public statements on these topics are to be avoided—especially in a criminal proceeding.

¶43 Further, Leavitt's deputy had expressed concern to Leavitt before the press conference about the associated risks. When Leavitt decided to go ahead with the press conference, he should have known that he needed to proceed with extreme caution and

avoid any commentary on the credibility of the State's witness or the defendant's guilt and character.

¶44 We credit Leavitt's explanation that he did not intend to harm the proceedings; he meant only to explain to the public his decision to pursue the death penalty. Leavitt felt the gravity of the decision he was making and had campaigned on "bring[ing] greater transparency . . . to the operations of the office." But when explaining his decision to the public, he strayed into comments that he should not have made. Unlike an attorney representing a party in a civil case, a prosecutor has an obligation to see that justice is done. *See State v. Saunders*, 1999 UT 59, ¶ 31, 992 P.2d 951 ("Prosecutors have duties that rise above those of privately employed attorneys" and so the prosecution's duty "in a criminal prosecution is not that it shall win a case, but that justice shall be done." (cleaned up)). This includes respecting the constitutional rights of the accused, like the presumption of innocence. A prosecutor, and especially an elected prosecutor who stands as an example to the public and the Bar, must be keenly aware of the duty to avoid prejudicing the potential jury pool.

¶45 Viewed in context, we conclude that these three statements, standing alone, constitute substantial evidence that Leavitt violated rule 3.6.[8] In total, this was a circumstance in which

---

[8] While we do not analyze the other statements Leavitt made, we note that the Committee found that some of them "were made carelessly, particularly given the significance of the case." For example, Leavitt stated that the alleged killer had treated the victims like "mere trash." *Supra* ¶ 28 (Statement 1). He acknowledged that imposing the death penalty could not bring the victims back and said that "[i]f pulling a trigger or injecting a needle would bring [the victims] back, [he] would do so personally." *Supra* ¶ 28 (Statement 6). At another point in the press conference, Leavitt said he was "aware that it w[ould] cost Utah County at least a million dollars more in defense funds," and that "if the alleged killer is given the death penalty . . . he may never be executed." *Supra* ¶ 28 (Statement 3). He also said that "there is no connection whatsoever to Utah County other than that's where this crime was committed" and "[h]ad this crime been committed in Juab County, Juab County would be writing a check for a million dollars." *Supra* ¶ 28 (Statements 4 and 5).

(continued . . .)

the county's top prosecutor publicly broadcast—including to the potential jury pool—his opinion that the defendant was the "sort of individual" from whom the public needed protection; his opinion that the defendant was guilty; his opinion that the State's witness was credible; and his assurance that his opinions were based on evidence—although no one, including the jury, would see that evidence. As the County Attorney making a public announcement in a high-profile capital case, Leavitt reasonably should have known these statements had a substantial likelihood of prejudicing the criminal proceedings.

## II. A PUBLIC REPRIMAND IS THE APPROPRIATE SANCTION FOR LEAVITT'S VIOLATION

¶46 After a screening panel determines that a lawyer has violated an ethical rule, it then recommends an appropriate sanction. *See* SUP. CT. R. PRO. PRAC. 11-511(g)(1). Here, after the Panel determined that Leavitt violated rule 3.6, it recommended that he be sanctioned with a public reprimand. *Supra* ¶ 15. Leavitt filed an exception to the determination and recommendation with the Committee Chair, who delegated the review of the exception to the Vice Chair. The Vice Chair affirmed the determination and recommendation, although the analysis differed to some extent. *Supra* ¶ 16.

¶47 Leavitt argues that the Committee misapplied the rules, and that he should have received an admonition instead of a public reprimand. "We . . . afford no deference to [the Committee's] interpretation of our rules." *Nemelka v. Ethics & Discipline Comm. of Utah Sup. Ct.*, 2009 UT 33, ¶ 9, 212 P.3d 525. And when we review a sanction imposed by the Committee, we "make an independent determination as to its correctness." *In re Discipline of Brussow*, 2012

---

We understand that Leavitt made some of these statements in an effort to be transparent with taxpayers about why he had decided to seek the death penalty in spite of the high cost. And the seriousness of the offense was relevant to that discussion. But we caution that in making a public statement in a circumstance like this one, a lawyer must remember that the statements may be heard by the potential jury pool. And the lawyer must respect and safeguard the defendant's right to due process and the presumption of innocence. To do this, a lawyer should avoid remarks that risk inflaming the public against the defendant or causing resentment of the process afforded him.

UT 53, ¶ 13, 286 P.3d 1246 (cleaned up); *see also Johnson v. Off. of Pro. Conduct,* 2014 UT 57, ¶ 14, 342 P.3d 280 ("We need not . . . defer to the Committee in deciding what may constitute appropriate discipline." (cleaned up)).

¶48   Although Leavitt's Order of Discipline was issued in 2023, the Committee and both parties have applied the sanctions rules in effect at the time of the press conference.[9] We are not sure that this is correct.[10] However, as no one has argued or briefed otherwise, we apply the 2019 rules without opining on the correctness of doing so. At that time, the Supreme Court Rules of Professional Practice required the Committee to consider four factors when imposing a sanction: "(a) the duty violated, (b) the lawyer's mental state, (c) the potential or actual injury caused by the lawyer's misconduct,

---

[9] The press conference took place in 2019. However, in the disciplinary proceedings, the Committee applied the 2020 rules, which are substantively similar to the 2019 rules. *Compare* SUP. CT. R. PRO. PRAC. 14-605(b)– (d) (2019), *with id.* R. 11-583(b)–(d) (2020).

[10] In general, we apply the substantive law in effect at the time of the event in question and the procedural rules in effect at the time of the adjudicative proceedings at issue. *See State v. Clark,* 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question. . . . [Thus], if the law regulates a motion to intervene, we apply the law as it exists at the time the motion is filed."). In the criminal context, this means that we apply the substantive law in effect at the time of the criminal conduct, and the sentencing rules (both in statute and in the Utah Rules of Criminal Procedure) in effect at the time of sentencing unless it would lead to a higher sentence. *See Weaver v. Graham*, 450 U.S. 24, 30 (1981) ("[T]he *ex post facto* prohibition . . . forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred."), *overruled on other grounds by Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995). Extending this principle to the attorney discipline context, we would apply the sanctions rules in effect at the time of the disciplinary proceeding, unless they would increase the applicable sanction. We do not opine on the correct approach here, since the issue has not been raised or briefed. However, we flag the issue in the event that it arises in a future proceeding.

and (d) the existence of aggravating or mitigating factors." SUP. CT. R. PRO. PRAC. 14-604 (2019).

¶49 After finding a violation, the Committee applies these factors in two steps. First, the Committee determines the presumptive sanction based on the lawyer's mental state and the level of potential or actual injury. *Id.* R. 14-605 (2019). Second, the Committee considers any aggravating or mitigating factors and determines whether the presumptive sanction should be adjusted up or down. *Id.* R. 14-607 (2019) ("After misconduct has been established, aggravating and mitigating circumstances may be considered and weighed in deciding what sanction to impose."); *see also In re Discipline of Bates*, 2017 UT 11, ¶ 46, 391 P.3d 1039 ("After determining the presumptive sanction as our starting point, we must determine whether a more or less severe sanction is warranted.").

*Presumptive Sanction*

¶50 The parties disagree about the appropriate presumptive sanction for Leavitt's conduct. Leavitt argues that it should be a private admonition or a public reprimand. The OPC argues that it should be a suspension.

¶51 The presumptive disciplinary sanction turns on Leavitt's mental state when he made the comments and the potential or actual harm that his comments caused. We conclude that the presumptive sanction for Leavitt's violation should be a public reprimand because he acted with at least a negligent mental state and his statements interfered with the proceedings in the Baum case and caused injury to the legal system.

¶52 The Supreme Court Rules of Professional Practice contain the rules governing sanctions in attorney discipline proceedings. Under the 2019 version of those rules:

- A private admonition is "generally appropriate when a lawyer . . . negligently engages in professional misconduct . . . and causes little or no injury to a party, the public, or the legal system or interference with a legal proceeding, but exposes a party, the public or the legal system to potential injury or causes potential interference with a legal proceeding." SUP. CT. R. PRO. PRAC. 14-605(d)(1) (2019).

- A public reprimand is "generally appropriate when a lawyer . . . negligently engages in professional misconduct . . . and causes injury to a party, the public, or the legal system, or causes interference with a legal proceeding." *Id.* R. 14-605(c)(1) (2019).

- A suspension is "generally appropriate when a lawyer . . . knowingly engages in professional misconduct . . . and causes injury or potential injury to a party, the public, or the legal system, or causes interference or potential interference with a legal proceeding." *Id*. R. 14-605(b)(1) (2019).

¶53 With respect to Leavitt's mental state, we conclude that he acted at least negligently. This may seem incongruent with the determination that Leavitt violated rule 3.6, which requires a showing that he knew or reasonably should have known that his statements were substantially likely to prejudice the proceedings. But as we will explain, "negligence" is akin to the "reasonably should have known" standard, while a knowing mental state reflects actual knowledge.

¶54 Under both the Rules of Professional Conduct and the Rules of Professional Practice, a knowing mental state essentially involves actual knowledge. To establish that an attorney violated rule 3.6 because the attorney "knew" his statements were substantially likely to cause prejudice, the Rules of Professional Conduct define "knowingly," "known," and "knows" as "actual knowledge of the fact in question." UTAH R. PRO. CONDUCT 1.0(g); *see also supra* ¶ 41. When determining the appropriate sanction under the Rules of Professional Practice for a knowing violation of a rule, "knowledge means the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." SUP. CT. R. PRO. PRAC. 14-601(f) (2019) (cleaned up). Although these definitions are phrased differently, they both reflect actual knowledge. We have explained in the sanctions context that to prove a knowing mental state, "the OPC must establish that the attorney was *consciously aware of a fact* that makes the attorney's conduct a violation of [the rule at issue], even though the attorney may not have intended to violate [the] rule[] or to harm that attorney's client." *Bates*, 2017 UT 11, ¶ 22 (emphasis added). So under both

sets of rules, a knowing mental state requires actual knowledge of the fact at issue—here, that the extrajudicial statements were substantially likely to prejudice an adjudicative proceeding.

¶55 Under the two sets of rules, "should have known" and "negligence" are defined similarly. To establish that an attorney "should have known" that his statements were substantially likely to prejudice an adjudicative proceeding, the Rules of Professional Conduct explain that "[r]easonably should know," "[w]hen used in reference to a lawyer," means that "a lawyer of reasonable prudence and competence would ascertain the matter in question." UTAH R. PRO. CONDUCT 1.0(o). The Rules of Professional Practice do not define "should have known," but they define "negligence" as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." SUP. CT. R. PRO. PRAC. 14-601(g) (2019) (cleaned up); *see also Bates*, 2017 UT 11, ¶¶ 42–45 (discussing the difference between a knowing and negligent state of mind for purposes of determining the correct presumptive sanction). Thus, "should have known" essentially equates to a negligent mental state.

¶56 We agree with the Committee that Leavitt's mental state was at least negligent.[11] There is ample evidence that Leavitt reasonably should have known that at least some of his statements had a substantial likelihood of materially prejudicing the proceedings. *See supra* ¶¶ 31, 45. And this is consistent with a negligent mental state, as both standards require that an attorney's actions deviate from what a reasonable lawyer would do in a similar situation. "[A] lawyer of reasonable prudence and competence would [have] ascertain[ed]," UTAH R. PRO. CONDUCT 1.0(o), that he should not comment in the way Leavitt did on subjects that have been specifically flagged in comment 5 as more likely than not to violate rule 3.6. Yet in the moment, that is what Leavitt did. Thus, he "deviat[ed] from the standard of care that a reasonable lawyer would exercise in the situation." SUP. CT. R. PRO. PRAC. 14-601(g) (2019). Accordingly, we conclude he was at least negligent. *See In re Conduct of Conry*, 491 P.3d 42, 58 (Or. 2021) (en banc) (per curiam) (equating evidence that an attorney should have known with a negligent mental state).

---

[11] While we arrive at the same result, our analysis differs. *See infra* ¶ 64 n.13.

¶57 With respect to the injury caused by the violation, Leavitt argues that his statements caused little injury. The Committee determined that Leavitt's statements harmed the legal proceeding because they caused significant, additional litigation and required the court to take extra measures to ensure that it could empanel a fair and impartial jury. *See supra* ¶¶ 12–14. But Leavitt asserts that much of the litigation in response to his comments involved other issues as well, and likely would have happened anyway. And he observes that the expanded jury venire and careful questioning during jury selection was sufficient to ensure that the jury was impartial.

¶58 We disagree with Leavitt's assessment of the harm caused by his conduct. We conclude that the Committee correctly found that his statements interfered with the proceedings in Baum's case and caused injury to the legal system.[12]

¶59 The statements interfered with the proceedings in that they caused significant pretrial litigation in the case, which took up the time and resources of the court and the parties. Shortly after the press conference, the district court issued an order *sua sponte*, warning the lawyers to "abide strictly by [r]ule 3.6" because "[p]re-trial publicity . . . can taint the prospective jury pool." Months later, defense counsel told the court that the video of the press conference was still up on the County Attorney's public Facebook page. After full briefing by the parties, the court held an evidentiary hearing on an order to show cause in which Leavitt was required to testify. While the court decided not to sanction Leavitt for failing to take down the press conference video, defense counsel later filed two motions for change of venue based in part on Leavitt's statements. Eventually the court disqualified Leavitt from further participation

---

[12] We want to be clear that we are not finding that these statements caused actual prejudice to Baum's trial. The district court took extra measures to ensure a fair and impartial jury was empaneled. The court expanded the jury venire and used juror questionnaires that dealt with pretrial publicity. Accordingly, nothing in this opinion should be read to suggest that Baum's right to a fair trial before an impartial jury was impaired by Leavitt's statements. But the fact that the court's actions were necessary to protect Baum's right to a fair trial supports the Committee's findings that Leavitt's actions interfered with the proceeding.

in the case, concluding that his statements in the press conference "violated rule 3.6."

¶60 We also conclude that Leavitt's comments harmed the legal system. A prosecutor—especially an elected prosecutor in a position of public trust like Leavitt—is an important emissary for our legal system. When Leavitt spoke to the public at the press conference, he was speaking as a representative of our justice system. *See Att'y Grievance Comm'n of Md. v. Gansler*, 835 A.2d 548, 560 (Md. App. Ct. 2003) ("Comments by prosecuting attorneys, in particular, have the inherent authority of the government and are more likely to influence the public."); *In re Brizzi*, 962 N.E.2d 1240, 1246 (Ind. 2012) ("A prosecutor's opinion of guilt is particularly likely to create prejudice, given that his or her words carry the authority of the government and are especially persuasive in the public's eye."). He stood as an example. In such a moment, it was important for the county's top prosecutor to conduct himself ethically. Many of Leavitt's statements did that. We credit him for his desire to explain his decision to pursue the death penalty to the people of Utah County who elected him.

¶61 However, his comments about Baum's character, his vouching for the State's witness, his expression of belief in Baum's guilt, and his other inflammatory statements did a disservice to the legal system by creating a substantial risk of tainting the jury pool, thereby jeopardizing a criminal defendant's constitutional right to a fair and impartial trial. Further, these comments impinged upon the presumption of innocence that is so important to our criminal justice system. While this may not have been Leavitt's intent, he spoke without due care at a time when he was center stage. And even negligent comments can "cause[] injury . . . to the legal system," especially when spoken by a person in a position of trust. SUP. CT. R. PRO. PRAC. 14-605(c)(1) (2019).

¶62 Thus, where Leavitt's mental state was at least negligent and he caused interference with the criminal proceedings and injury to the legal system, the presumptive sanction is a public reprimand.

*Aggravating and Mitigating Factors*

¶63 We now consider any aggravating or mitigating factors to "determine whether a more or less severe sanction is warranted." *Bates*, 2017 UT 11, ¶ 46. But we do not consider aggravating and mitigating factors lightly; "[t]o justify a departure from the presumptive level of discipline . . . the aggravating and mitigating

factors must be significant." *In re Ince*, 957 P.2d 1233, 1237–38 (Utah 1998); *see also Bates*, 2017 UT 11, ¶ 46 ("[A]n increase or decrease in the type of sanction requires unusual or substantial factors . . . .").

¶64 The Committee found Leavitt's "substantial experience in the practice of law" to be an aggravating factor. And it found his "absence of a prior record of discipline, absence of dishonest or selfish motive, and timely good faith effort to rectify the consequences of the misconduct" to be mitigating factors. Concluding that the "presence of multiple mitigating factors overrides the sole aggravating factor," the Committee decided that a downward departure from the presumptive sanction was warranted. Notably, however, because the Committee at times conflated the two steps of the sanctions process—blending the determination of the presumptive sanction with the consideration of aggravating and mitigating factors—it determined that the ultimate sanction should be a public reprimand.[13]

---

[13] At one point in the Screening Panel's consideration of the appropriate sanction, it indicated on its decision sheet that the presumptive sanction was a public reprimand. But later the Panel seemed to suggest that it arrived at an ultimate sanction of a public reprimand only after balancing the aggravating and mitigating factors, saying, "Ultimately the screening panel concludes the presence of multiple mitigating factors overrides the sole aggravating factor, thereby justifying the sanction of a public reprimand." The Panel also appears to have considered the mitigating factors when determining Leavitt's mental state, rather than using the factors to increase or reduce the overall sanction, when it said, "The presence of multiple mitigating factors overrides the sole aggravating factor, thereby justifying a finding of negligently violating [r]ule 3.6(a) instead of knowingly or intentionally violating the rule."

The Vice Chair's reasoning also blurred the two steps of the sanctions process at times. The Vice Chair incorrectly explained that "the Panel is asked to consider the mental state of the [attorney]" when "considering the aggravating and mitigating circumstances that led to the violation" and that "[i]ntentionally or knowingly violating a rule is an aggravating factor when considering appropriate discipline, while violations based on negligence can be viewed as mitigating." The Vice Chair ultimately

(continued . . .)

¶65  While we disagree with the Committee that a downward departure is warranted, we end up in the same place, with a public reprimand as the final, appropriate sanction. We conclude that neither the aggravating nor the mitigating factors are so unusual or substantial that they justify a downward or upward departure from the presumptive sanction.

¶66  On one hand, Leavitt had a good reputation in the legal community and had no history of prior disciplinary proceedings. We also appreciate that he promptly took steps to rectify the damage he caused by walling himself off from the case, instructing his team to take the video of the press conference off of the County Attorney's public Facebook page, and adjusting his practice for future press conferences.[14] However, we note that he testified that he did so only because his deputy thought his conduct at the press conference had been problematic, not because he thought what he had done was wrong.

¶67  The one aggravating factor is that Leavitt had considerable experience practicing law, particularly within the criminal justice system. Further, he was not just experienced, but was occupying an important position of public trust at the time he made the comments.

¶68 However, on balance we do not view any of the aggravating or mitigating factors as so "unusual or substantial" as to justify a departure from the presumptive sanction. *Bates*, 2017 UT 11, ¶ 46.

---

concluded that Leavitt's mental state was negligent rather than knowing.

The OPC concedes that "this aspect of the Committee's analysis was erroneous, because aggravating and mitigating factors may only be applied to increase or reduce the overall sanction; they may not be applied to adjust a respondent's mental state." We agree.

[14] While Leavitt's remedial actions after the press conference do not persuade us to depart downward from the presumptive sanction, they did factor into our determination of the presumptive sanction. His actions are relevant to the initial determination of his mental state, because they help demonstrate that he did not knowingly make prejudicial statements but instead acted negligently.

¶69 Both parties argue that additional factors existed that the Committee failed to consider. However, none of them persuade us that an upward or downward departure is warranted.

¶70 Leavitt argues that the Committee failed to consider four additional mitigating factors: his cooperative attitude toward the proceedings, his remorse, his good character and reputation, and the imposition of other penalties and sanctions because the district court disqualified Leavitt from further participation in Baum's case. The OPC opposes Leavitt's characterization of himself as penitent and asks us to recognize "Leavitt's refusal to admit the wrongful nature of his misconduct [as] an aggravating factor."

¶71 We do not think Leavitt's attitude toward the disciplinary proceedings clearly falls in either the aggravating or mitigating categories. While Leavitt was cooperative during his attorney discipline proceedings, we expect that most lawyers would be, and he has continuously maintained that his comments "could not have prejudiced the proceeding." And Leavitt had already voluntarily walled himself off from Baum's case when the district court disqualified him from further participation. As for the other additional factors, they either overlap with factors that have already been considered or are not significant enough to justify departure from the presumptive sanction.

¶72 For these reasons, we agree with the Committee's ultimate recommendation that Leavitt be publicly reprimanded for his violation of rule 3.6.

## CONCLUSION

¶73 As the district court noted in support of its conclusion that Leavitt violated rule 3.6, some of Leavitt's comments at the press conference were "textbook examples of extrajudicial statements carrying a substantial likelihood of prejudicing the adjudication of this case." While we agree with the Committee's assessment that Leavitt did not intend to cause any harm to the proceedings or the legal profession, he should have known that his statements had a substantial likelihood of doing so. We conclude he was at least negligent in making the statements, and that the comments interfered with the proceedings in the Baum case and injured the legal profession. Accordingly, we approve the Committee's determination that Leavitt violated rule 3.6 and conclude that the appropriate sanction is a public reprimand.